SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**Cathleen Quinn v. David J. Quinn** (A-5-14) (074411)

**Argued October 13, 2015 – May 3, 2016**

**CUFF, P.J.A.D. (temporarily assigned) writing for a majority of the Court.**

In this appeal, the Court considers whether the trial court may suspend alimony for the period of time the alimony recipient cohabited, rather than terminate alimony, as required by the express terms of the parties' agreement.

Plaintiff Cathleen Quinn and defendant David J. Quinn married on August 27, 1983. On January 3, 2006, the Quinns divorced and entered into a property settlement agreement (PSA). Each party was represented by independent counsel. When the parties divorced, David's annual income was $208,900, while Cathleen's was $21,476. The PSA provided that David would pay Cathleen $2,643 in alimony biweekly, subject to annual increases for inflation. The PSA stated that "alimony shall terminate upon the Wife's death, the Husband's death, the Wife's remarriage, or the Wife's cohabitation, per case or statutory law, whichever shall first occur."

In March 2010, David filed a motion to terminate alimony on the grounds that Cathleen was cohabiting with John Warholak, whom Cathleen met in August 2007. The trial court ordered a hearing to determine whether Cathleen's relationship with Warholak constituted cohabitation. Prior to the hearing, the parties agreed that the facts would be evaluated under the definition of cohabitation set forth in Konzelman v. Konzelman, 158 N.J. 185 (1999). At the hearing, Cathleen did not deny that she and Warholak had a romantic relationship, but disputed claims that they cohabited. Cathleen testified that she understood cohabitation to mean "living with someone on a full time basis." The trial court found Cathleen's answers evasive and inconsistent and concluded that she was not a credible witness and had litigated in bad faith. Further, on the issue of cohabitation, the court found that Cathleen and Warholak had an exclusive relationship and had been cohabiting from January 2008 through April 2010. The court also found that the PSA was fair and equitable, that Cathleen had entered into the PSA voluntarily, and that she had consented to all of its provisions. Having determined that Cathleen and Warholak had cohabited, the trial court invoked its equitable powers and suspended alimony for the period of cohabitation -- from January 2008 until April 2010 -- but declined to terminate alimony permanently. The court also awarded David $145,536.74 in attorneys' fees and costs. The court permitted David to reduce his continuing alimony payments by fifty percent for fifty-six months, until he had recovered the combined value of the payments he had made during the cohabitation period and the counsel fees.

David appealed the trial court's decision to suspend, rather than terminate, alimony, arguing that the terms of the PSA, coupled with Cathleen's behavior during the trial court proceedings, mandated that alimony be terminated. Cathleen cross-appealed, challenging the trial court's decision that she had cohabited, the validity of the cohabitation provision, and the attorneys' fee award. On appeal, the Appellate Division affirmed, denied Cathleen's appeal, concluded that the trial court properly found that the cohabitation provision was valid and that Cathleen had cohabited with Warholak. The panel also determined that the trial court did not abuse its discretion in awarding attorneys' fees to David. The Quinns filed cross-petitions for certification. The Court granted certification on David's petition and denied certification on Cathleen's petition. Quinn v. Quinn, 219 N.J. 631 (2014).

**HELD**: An agreement to terminate alimony upon cohabitation, entered by fully informed parties, represented by independent counsel, and without any evidence of overreaching, fraud, or coercion, is enforceable. The trial court was required to apply the remedy of termination, as fashioned by the parties.

1. There is a strong public policy favoring stability of arrangements in matrimonial matters. Therefore, fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed. When the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result. To the extent that there is any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent. (pp. 11-12)

2. An agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business

dispute. The law grants particular leniency to agreements made in the domestic arena and vests judges with greater discretion when interpreting such agreements. This leniency is derived from the terms of the marital agreement and the nature of some post-judgment issues, such as custody of children and financial support for the family, which may require modification of the marital agreement over the years as events occur that were never contemplated by the parties. In other instances, however, resort to traditional tenets of contract interpretation may be appropriate, such as when there is a missing term that is essential to implementation of a matrimonial agreement. Application of this rule was appropriate, for example, when the judgment of divorce did not address the valuation date of the marital home when it was not sold on the date identified in the agreement. A narrow exception to the general rule of enforcing settlement agreements as the parties intended is the need to reform a settlement agreement due to unconscionability, fraud, or overreaching in the negotiations of the settlement. (pp. 12-14)

3. Alimony is an economic right that arises out of the marital relationship and provides the dependent spouse with a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage. In divorce actions, courts may award alimony as the circumstances of the parties and the nature of the case shall render fit, reasonable and just. Parties to a divorce action may enter into voluntary agreements governing the amount, terms, and duration of alimony, and such agreements are subject to judicial supervision and enforcement. Agreements between separated spouses executed voluntarily and understandingly for the purpose of settling the issue of alimony and child support are specifically enforceable, but only to the extent that they are just and equitable. (pp. 15-17)

4. New Jersey has a longstanding policy of terminating alimony permanently when the recipient spouse remarries. Alimony that has been terminated due to remarriage is not revived if the remarriage ends. Unlike remarriage, cohabitation does not terminate alimony in all instances. In the absence of an agreement that permits the obligor former spouse to cease payment of alimony, this Court has permitted a modification of alimony, including cessation thereof, in the event of post-divorce cohabitation only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle the supporting spouse to relief. On the other hand, when the parties have outlined the circumstances that will terminate the alimony obligation, this Court has held that it will enforce voluntary agreements to terminate alimony upon cohabitation, even if cohabitation does not result in any changed financial circumstances. Agreements to terminate alimony upon the cohabitation of the recipient spouse are enforceable so long as the relationship constitutes cohabitation and the cohabitation provision of the PSA was voluntary, knowing and consensual. (pp. 17-19)

5. Here, the trial court findings fully demonstrated that Cathleen was engaged in the type of relationship that constitutes cohabitation as contemplated by Konzelman. The only disputed issues are whether the cessation of cohabitation and the circumstances at the time the agreement was executed warrant enforcement of the agreement. Cessation of cohabitation does not warrant departure from the agreed terms of the PSA. Cathleen and Warholak cohabited for almost two and one-half years and continued to do so for one month after David filed the motion to terminate alimony. This is no different from a remarriage that terminates by death or divorce. In light of the parties' agreement, the circumstances do not call for a different result. Cathleen was represented by independent counsel when the PSA was negotiated and executed. She alleged no improprieties and suggested no fraud, overreaching, or coercion. The parties' testimony and the trial court's findings reveal that each party understood the events that would trigger termination of alimony and the meaning of the critical term in this appeal -- cohabitation. The remedy fashioned by the trial court and affirmed by the Appellate Division created an agreement different from the one to which the Quinns agreed. An agreement to terminate alimony upon cohabitation, entered by fully informed parties, represented by independent counsel, and without any evidence of overreaching, fraud, or coercion, is enforceable. It is irrelevant that the cohabitation ceased during trial when that relationship had existed for a considerable period of time. (pp. 20-26)

The judgment of the Appellate Division is **REVERSED**.

**JUSTICE ALBIN, DISSENTING**, joined by **JUSTICE LaVECCHIA**, expresses the view that an anti-cohabitation clause, untethered to economic needs, is contrary to public policy and unenforceable.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in JUDGE CUFF's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which JUSTICE LaVECCHIA joins. JUSTICE FERNANDEZ-VINA did not participate.**

CATHLEEN QUINN,

    Plaintiff-Respondent,

       v.

DAVID J. QUINN,

    Defendant-Appellant.

Argued October 13, 2015 – Decided May 3, 2016

On certification to the Superior Court,
Appellate Division.

Bonnie C. Frost argued the cause for
appellant (Einhorn, Harris, Ascher,
Barbarito & Frost, attorneys; Ms. Frost and
Matheu D. Nunn, on the brief).

John V. McDermott, Jr., argued the cause for
respondent.

    JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

    In this appeal, the property settlement agreement (PSA) governing the terms of the parties' divorce provided that alimony would terminate if the spouse receiving alimony cohabited with another. We address whether the trial court may suspend alimony for the period of time the alimony recipient cohabited rather than terminate alimony as required by the express terms of the PSA. Under the circumstances of the record

developed at trial, we hold that the trial court was required to apply the remedy of termination, as fashioned by the parties.

The parties divorced in 2006. Pursuant to the terms of the PSA that governed the divorce, David J. Quinn agreed to pay alimony to Cathleen Quinn,[1] and she agreed that David's obligation to pay alimony would terminate on his death, her death, her remarriage, or her cohabitation with another.

By January 2008, Cathleen was in what she described as a committed relationship with a man she had met in August 2007. David moved to terminate his alimony obligation. Following a protracted sixteen-day trial over a period of eleven and one-half months, the trial court found that Cathleen had cohabited with John Warholak from January 2008 to April 2010. Because the cohabitation had ceased during the course of the trial, the trial judge suspended, rather than terminated, David's alimony obligation for the period of cohabitation. The trial judge reinstated alimony as of the date cohabitation ceased and permitted David to pay one-half of his alimony obligation until he recouped the alimony paid during cohabitation and the attorneys' fees awarded to him by the trial court. The Appellate Division affirmed, determining that the trial court

---

[1] To avoid confusion, we refer to the parties by their first names. We mean no disrespect by this informality.

2

did not exceed its equitable authority to fashion an appropriate remedy.  We now reverse.

Marital agreements, including PSAs that clearly and unequivocally provide for the termination of alimony upon cohabitation, are enforceable when the parties enter such agreements knowingly and voluntarily.  Here, the trial court found that Cathleen knowingly and voluntarily agreed that David's obligation to pay alimony would cease upon the occurrence of certain clearly defined events, including cohabitation.  The trial court also found that Cathleen had cohabited with her boyfriend for twenty-eight months, thereby warranting the termination of alimony.  Noting the income disparity between Cathleen and David, the trial court fashioned a remedy that transformed the post-marital obligations owed by the parties to each other.  The record developed in this matter provides no basis to do anything other than to enforce the clear and unequivocal obligations undertaken by both parties to each other under the PSA.

We therefore reverse the judgment of the Appellate Division that affirmed suspension of alimony during the period of cohabitation and reinstatement of alimony following cessation of cohabitation.

I.

A.

3

Plaintiff Cathleen Quinn and defendant David J. Quinn (the Quinns) married on August 27, 1983. They have a daughter and son, both of whom are now emancipated. On January 3, 2006, after twenty-three years of marriage, the Quinns divorced and entered into a PSA. Each party was represented by independent counsel.

At the time of the divorce, David's annual income was $208,900 and Cathleen's annual income was $21,476. The PSA provided that David would pay Cathleen a biweekly alimony payment of $2634, subject to annual increases for inflation based on the Consumer Price Index. The PSA stated that "alimony shall terminate upon the Wife's death, the Husband's death, the Wife's remarriage, or the Wife's cohabitation, per case or statutory law, whichever event shall first occur."

The PSA also gave Cathleen primary physical custody of their son, who was fifteen years of age when the Quinns divorced. Their daughter, aged eighteen, was no longer a minor and was therefore not covered by the custody agreement. In addition to the alimony payments, David was required to pay Cathleen child support of $360 each week, subject to modification when their son graduated high school and when their daughter graduated from college.

In March 2010, David filed a motion to terminate alimony on the grounds that Cathleen was cohabiting with John Warholak,

4

whom Cathleen met in August 2007. The trial court ordered a plenary hearing to determine whether Cathleen's relationship with Warholak constituted cohabitation. Prior to the hearing, the parties agreed that the facts would be evaluated under the definition of cohabitation set forth in Konzelman v. Konzelman, 158 N.J. 185 (1999). The trial judge permitted limited discovery and advised the parties that he was inclined to award counsel fees to the prevailing party given the nature of the factual disputes and resulting likelihood of false certifications.

The plenary hearing began on August 30, 2010, and continued for sixteen trial days over a period of more than eleven months. At the hearing, Cathleen did not deny that she and Warholak had a romantic relationship. The parties, however, disputed whether Cathleen and Warholak cohabited. Cathleen testified that she did not cohabit with Warholak and that she understood cohabitation to mean "living with someone on a full time basis." She stated, "I fully understand that if I lived with someone full time, all the time, and shared a house with somebody that would be cohabitation and alimony would be terminated[.]" When asked if she understood that cohabitation would cause her to lose her alimony "[f]orever[,]" she replied "[y]es."

The trial court found that Cathleen's answers "were often evasive and inconsistent" and that "there were numerous times

5

when [Cathleen] was confronted with documents that were inconsistent with her prior testimony and she had to modify or change her testimony." Ultimately, the trial court concluded that Cathleen was not a credible witness.

On the issue of cohabitation, the trial court found that Cathleen and Warholak had an "intimate and committed relationship" that was "exclusive" and lasted for over two years. The trial court also found that Warholak had been living in Cathleen's home for over two years, although he maintained a residence of his own. Documentary evidence showed that Warholak used Cathleen's address as his own, made phone calls from Cathleen's home, and was consistently at the home even when Cathleen was absent. In addition, the trial court found that Cathleen's relationship with Warholak was openly recognized by their "family and social circle" as a partnership. Finally, the trial court found that Cathleen and Warholak "acted as a committed couple in terms of their living and financial relationships."

Applying the governing definition of cohabitation expressed in Konzelman, supra, 158 N.J. at 202-03, the trial court concluded that Cathleen and Warholak had cohabited for over two years from January 2008 through April 2010, ending one month after David filed his motion to terminate alimony. The trial court also found that the PSA was "fair and equitable[,]" that

6

Cathleen had entered into the PSA voluntarily, and that Cathleen had consented to all provisions of the PSA.

Having determined that Cathleen and Warholak had cohabited, the trial court invoked its equitable powers and suspended alimony for the period of cohabitation -- from January 2008 until April 2010 -- but declined to terminate alimony permanently. The trial court based its decision on the great difference in incomes between Cathleen and David, concluding that Cathleen was "entirely dependent on her alimony for her support."

Finally, the trial court found that Cathleen was not credible in her testimony, that she had litigated in bad faith, and that she had falsely denied cohabitation. The court therefore awarded David $145,536.74 in attorneys' fees and costs. The court permitted David to reduce his continuing alimony payments by fifty percent for fifty-six months, until he had recovered the combined value of the payments he had made during the cohabitation period and the counsel fees.

### B.

David appealed the trial court's decision to suspend, rather than terminate, alimony, arguing that the terms of the PSA, coupled with Cathleen's behavior during the trial court proceedings, mandated that alimony be terminated. Cathleen cross-appealed, challenging the trial court's decision that she

7

had cohabited, the validity of the cohabitation provision, and the attorneys' fee award.  The Appellate Division affirmed.

The appellate panel determined that the trial court did not err as a matter of law in temporarily suspending, rather than terminating, David's alimony obligation.  The panel acknowledged that a voluntary and knowing settlement agreement should generally be enforced in accordance with its terms, but stated that the family court maintains "its equitable jurisdiction and its responsibility to ensure fairness" in enforcing a cohabitation provision.  The panel therefore found that "the court here could consider all the relevant factors to determine whether an alternative remedy was more equitable in the particular circumstances of this case."  The panel cautioned against the frequent use of equitable remedies to subvert enforceable agreements, but nonetheless concluded that the trial court "did not exceed its equitable powers or abuse its discretion" in granting suspension of alimony instead of termination.

The panel also denied Cathleen's appeal, concluding that the trial court properly found that the cohabitation provision was valid and that Cathleen had cohabited with Warholak.  The panel also determined that the trial court did not abuse its discretion in awarding attorneys' fees to David.

8

The Quinns filed cross-petitions for certification. We granted certification on David's petition and denied certification on Cathleen's petition. Quinn v. Quinn, 219 N.J. 631 (2014). The sole issue before the Court is whether the trial court properly invoked its equitable power to modify the clear and unequivocal terms of a PSA entered knowingly and voluntarily by both parties.

II.

A.

David argues that, when Cathleen chose to cohabit with Warholak, alimony terminated in accordance with the PSA and was not subject to reinstatement. He maintains that the parties had a "clear and unambiguous" agreement to terminate alimony upon Cathleen's cohabitation, and that the trial court indisputably determined that Cathleen and Warholak cohabited. David argues accordingly that the trial court's decision to suspend, rather than terminate, alimony is contrary to this Court's well-established jurisprudence in favor of enforcing marital settlement agreements.

David also argues that, assuming the trial court has equitable authority to modify the terms of a PSA, the court should not have suspended alimony in this instance, due to Cathleen's egregious conduct before and during the trial. David contends that the trial court's decision gives an alimony

recipient free rein to "cohabit, lie about it, and if caught, reject the paramour, revive alimony, and then cohabit again."

B.

Cathleen argues that the trial court's decision to suspend alimony was permissible and appropriate under the circumstances. She maintains that her cohabitation relationship with Warholak was not stable, permanent, or long-lasting and gave her no economic benefits. Further, Cathleen argues that the language of the PSA was not specific, definitive, or written in plain language; was not mutually understood by the parties; and did not specify how long cohabitation had to exist in order for alimony to be terminated. Therefore, Cathleen contends that it would be inequitable to enforce the agreement because she did not fully understand the consequences of the cohabitation clause in the termination provision.

Cathleen maintains that alimony payments are like a pension in that they are a reward for labor -- the labor of taking care of the home and the family. Cathleen notes that she supported her husband's career advancement and took care of their home and family for over twenty years, and argues that she has a right to alimony based on that relationship. Thus, Cathleen contends that it would be inequitable to terminate alimony permanently based on a relatively short period of cohabitation from which she gleaned no economic benefits.

10

III.

A.

Settlement of disputes, including matrimonial disputes, is encouraged and highly valued in our system. Konzelman, supra, 158 N.J. at 193. Indeed, there is a "'strong public policy favoring stability of arrangements' in matrimonial matters." Ibid. (quoting Smith v. Smith, 72 N.J. 350, 360 (1977)). This Court has observed that it is "shortsighted and unwise for courts to reject out of hand consensual solutions to vexatious personal matrimonial problems that have been advanced by the parties themselves." Ibid. (quoting Petersen v. Petersen, 85 N.J. 638, 645 (1981)). Therefore, "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed." Id. at 193-94 (quoting Smith, supra, 72 N.J. at 358). Moreover, a court should not rewrite a contract or grant a better deal than that for which the parties expressly bargained. Solondz v. Kornmehl, 317 N.J. Super. 16, 21-22 (App. Div. 1998).

A settlement agreement is governed by basic contract principles. J.B. v. W.B., 215 N.J. 305, 326 (2013) (citing Pacifico v. Pacifico, 190 N.J. 258, 265 (2007)). Among those principles are that courts should discern and implement the intentions of the parties. Pacifico, supra, 190 N.J. at 266 (citing Tessmar v. Grosner, 23 N.J. 193, 201 (1957)). It is not

11

the function of the court to rewrite or revise an agreement when the intent of the parties is clear. J.B., supra, 215 N.J. at 326 (citing Miller v. Miller, 160 N.J. 408, 419 (1999)). Stated differently, the parties cannot expect a court to present to them a contract better than or different from the agreement they struck between themselves. Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960) (citations omitted). Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result. See Sachau v. Sachau, 206 N.J. 1, 5-6 (2011) ("A court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose." (internal quotations and citations omitted)). To the extent that there is any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent. Pacifico, supra, 190 N.J. at 267.

An agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business dispute. Sachau, supra, 206 N.J. at 5; Pacifico, supra, 190 N.J. at 265-66; Petersen, supra, 85 N.J. at 642. To be sure, "the law grants particular leniency to agreements made in the domestic

12

arena" and vests "judges greater discretion when interpreting such agreements." Pacifico, supra, 190 N.J. at 266 (quoting Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992)). This leniency is derived from the terms of the marital agreement and the nature of some post-judgment issues, such as custody of children and financial support for the family, that may require modification of the marital agreement over the years as events occur that were never contemplated by the parties. Nevertheless, the court must discern and implement "the common intention of the parties[,]" Tessmar, supra, 23 N.J. at 201, and "enforce [the mutual agreement] as written[,]" Kampf, supra, 33 N.J. at 43.

Pacifico, supra, illustrates a case in which the parties asserted that there was a clear and mutual understanding between them about a term of the agreement at the time they executed the agreement. 190 N.J. at 267. When they sought to execute that provision, however, each party asserted an understanding of the provision that differed from the other party's understanding. Ibid. Under the circumstances, an evidentiary hearing was required. Ibid.

The Pacifico Court instructs that for equitable reasons normal tenets of contract interpretation are sometimes not applicable to matrimonial matters. Id. at 268. For instance, the doctrine of contra proferentem, which requires a court to

13

interpret an ambiguous clause in favor of the non-drafting party, usually does not apply in a matrimonial setting because the matrimonial agreement is commonly the product of negotiation, not only over the general terms of the agreement but also over the language in the agreement.  Id. at 267-68. Furthermore, that doctrine assumes unequal bargaining positions. Ibid.

In other instances, however, resort to traditional tenets of contract interpretation may be appropriate, such as when there is a missing term that is essential to implementation of a matrimonial agreement.  Id. at 266.  Then, the court may supply the missing term.  Ibid. (citing Restatement (Second) of Contracts § 204 (1981)).  Application of this rule was appropriate, for example, when the judgment of divorce did not address the valuation date of the marital home when it was not sold on the date identified in the agreement.  Sachau, supra, 206 N.J. at 8-9.

A narrow exception to the general rule of enforcing settlement agreements as the parties intended is the need to reform a settlement agreement due to "unconscionability, fraud, or overreaching in the negotiations of the settlement[.]" Miller, supra, 160 N.J. at 419.  Guglielmo, supra, illustrates a case where strict adherence to the unambiguous provisions of the PSA could not occur due to the unconscionable nature of the PSA.

14

253 N.J. Super. at 535. The parties had been married for seventeen years and had three children. Id. at 539. The wife had left her employment as a secretary at her husband's request and had not been employed outside the home for seventeen years at the time of the divorce. Id. at 536, 539. At her husband's suggestion, she consulted his cousin to represent her in the divorce proceeding. Id. at 539. Due to her unfamiliarity with the household finances, her husband constructed a "rough budget" for the calculation of support. Ibid. The PSA provided no permanent support to the wife or a waiver of alimony. Id. at 541. The husband paid only $50 per week, per child, in child support. Id. at 539.

The budget drafted by the husband was "vastly inadequate to support [the wife] and her children." Ibid. The wife and children moved from a four-bedroom home situated on two acres to a two-bedroom home. Ibid. The wife obtained part-time employment, as did her children, two of whom were only fourteen years of age. Ibid. Finding that the wife's interests were not properly or adequately addressed in the agreement due to overreaching by the husband, a lack of impartiality by her attorney, and a failure to address spousal support following the sale of the marital home, the Appellate Division declined to adhere to strict contract principles in interpreting the

15

agreement and concluded that the agreement must be modified because it was unconscionable.  Id. at 541-42.

B.

In this appeal, we consider a spouse's receipt of alimony under a PSA and the circumstances in which alimony may be terminated.

Alimony is an "economic right that arises out of the marital relationship and provides the dependent spouse with 'a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage.'"  Mani v. Mani, 183 N.J. 70, 80 (2005) (quoting Stiffler v. Stiffler, 304 N.J. Super. 96, 99 (Ch. Div. 1997)). "In divorce actions, courts may award alimony 'as the circumstances of the parties and the nature of the case shall render fit, reasonable and just[.]'"  Innes v. Innes, 117 N.J. 496, 503 (1990) (quoting N.J.S.A. 2A:34-23).  "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation."  Ibid. (citing Mahoney v. Mahoney, 91 N.J. 488, 501-02 (1982)).  This permits the spouse "to share in the accumulated marital assets to which he or she contributed."  Konzelman, supra, 158 N.J. at 195 (citing Mahoney, supra, 91 N.J. at 500-01).

Parties to a divorce action may enter into voluntary agreements governing the amount, terms, and duration of alimony,

16

and such agreements are subject to judicial supervision and enforcement. Id. at 203 (citing Petersen, supra, 85 N.J. at 644). "Agreements between separated spouses executed voluntarily and understandingly for the purpose of settling the issue of [alimony and child support] are specifically enforceable, but only to the extent that they are just and equitable." Berkowitz v. Berkowitz, 55 N.J. 564, 569 (1970) (citing Schlemm v. Schlemm, 31 N.J. 557, 584 (1960); Equitable Life Assur. Soc. of U.S. v. Huster, 75 N.J. Super. 492, 512-13 (App. Div. 1962)). A "trial court has the discretion to modify the agreement upon a showing of changed circumstances." Ibid. (citing Flicker v. Chenitz, 55 N.J. Super. 273, 292 (App. Div.), certif. granted, 30 N.J. 152, appeal dismissed by consent, 30 N.J. 566 (1959)). Changed circumstances include "an increase in the cost of living, an increase or decrease in the income of the supporting or supported spouse, cohabitation of the dependent spouse, illness or disability arising after the entry of the judgment, and changes in federal tax law." J.B., supra, 215 N.J. at 327 (citing Lepis v. Lepis, 83 N.J. 139, 151 (1980)). In deciding whether to modify an agreement due to changed circumstances, "[t]he proper criteria are whether the change in circumstance is continuing and whether the agreement or decree has made explicit provision for the change." Lepis, supra, 83 N.J. at 152.

17

The law also governs when the obligation to pay alimony terminates. N.J.S.A. 2A:34-25. This State has a longstanding policy of terminating alimony permanently when the recipient spouse remarries. Ibid.; Flaxman v. Flaxman, 57 N.J. 458, 461 (1971) (citing N.J.S.A. 2A:34-25; Ferreira v. Lyons, 53 N.J. Super. 84, 86-87 (Ch. Div. 1958)). Alimony that has been terminated due to remarriage is not revived if the remarriage ends. See Flaxman, supra, 57 N.J. at 463 (holding that, even where remarriage is annulled, alimony may not be reinstated).

Unlike remarriage, cohabitation does not terminate alimony in all instances. Gayet v. Gayet, 92 N.J. 149, 153-54 (1983). In the absence of an agreement that permits the obligor former spouse to cease payment of alimony, this Court has permitted a modification of alimony, including cessation of alimony, in the event of post-divorce cohabitation "only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle the supporting spouse to relief." Ibid.

On the other hand, when the parties have outlined the circumstances that will terminate the alimony obligation, this Court has held that it will enforce voluntary agreements to terminate alimony upon cohabitation, even if cohabitation does not result in any changed financial circumstances. Konzelman, supra, 158 N.J. at 197. Agreements to terminate alimony upon the cohabitation of the recipient spouse are enforceable so long

18

as the relationship constitutes cohabitation and "the cohabitation provision of the [PSA] was voluntary, knowing and consensual." Id. at 203.

In Konzelman, a divorced couple had entered into a PSA whereby "Mr. Konzelman's support and maintenance obligation of $700.00 per week would terminate should Mrs. Konzelman undertake cohabitation with an unrelated adult male for a period of four consecutive months." Id. at 191. After hiring a private investigator, Mr. Konzelman discovered that Mrs. Konzelman had been cohabiting with another man. Ibid. Mr. Konzelman therefore stopped making alimony payments, and the parties went to court. Id. at 192. After a plenary hearing, the trial court determined that although Mr. Konzelman had established that cohabitation had occurred, the provision in the PSA authorizing termination of alimony upon cohabitation was invalid. Ibid. The trial court therefore reduced, but did not eliminate, Mr. Konzelman's alimony payments. Id. at 193.

On appeal, the Appellate Division reversed, finding that the PSA was enforceable. Ibid. This Court affirmed, finding that the agreement was voluntary, knowing and consensual, and that the "provision terminating alimony upon cohabitation [was] fair under the circumstances of the case[.]" Id. at 203. The setting of Konzelman, however, did not require the Court to "determine what would happen if the cohabitation came to an end,

19

including whether other, additional obligations of support could arise from the cohabitation arrangement itself." Ibid. We are now called upon to consider this issue.

IV.

In this appeal, the parties agreed that David would pay biweekly alimony in the amount of $2634 to Cathleen.[2] The PSA provides that "alimony shall terminate upon the Wife's death, the Husband's death, the Wife's remarriage, or the Wife's cohabitation, per case or statutory law, whichever event shall first occur." The parties thereby agreed, clearly and unequivocally, that David's obligation to pay alimony would cease upon Cathleen's cohabitation.

When the parties entered into the PSA, the Legislature had not yet spoken on whether cohabitation, like remarriage, could permanently terminate alimony responsibilities.[3] According to

---

[2] The PSA provides that alimony would increase yearly in accordance with increases in the Consumer Price Index. David testified that, based on these increases, his current biweekly alimony obligations amounted to roughly $3000.

[3] On September 10, 2014, the Legislature enacted N.J.S.A. 2A:34-23, which provides that "[a]limony may be suspended or terminated if the payee cohabits with another person." L. 2014, c. 42, § 1. The Legislature clarified that this law "shall not be construed either to modify the duration of alimony ordered or agreed upon or other specifically bargained for contractual provisions that have been incorporated into: a. a final judgment of divorce or dissolution; b. a final order that has concluded post-judgment litigation; or c. any enforceable written agreement between the parties." Id. § 2. Because this

20

the case law in effect at the time the parties executed their matrimonial agreement, cohabitation was considered a relationship that was "shown to be serious and lasting." Konzelman, supra, 158 N.J. at 203.  In Konzelman, the evidence adduced at trial demonstrated that the couple lived together most of the time, shared household chores, established a joint savings account, and presented themselves to family and others as being in a close and sustained relationship, which supported a finding of cohabitation.  Id. at 202.

Here, the trial court findings, which are not the subject of this appeal, fully demonstrated that Cathleen was engaged in the type of serious, stable, and enduring relationship that constitutes cohabitation as contemplated by Konzelman.  The only disputed issues are whether the cessation of cohabitation and the circumstances at the time the agreement was executed warrant enforcement of the agreement.

Here, the cessation of cohabitation does not warrant departure from the agreed terms of the PSA.  Cathleen and Warholak cohabited for almost two and one-half years.  During that time, they presented themselves to family, friends, and coworkers as a couple.  Warholak called Cathleen's employer when she was ill, advocated on her behalf with her employer, cared

_____

law was enacted after the PSA was entered, it does not govern this case, and the terms of the PSA apply.

21

for Cathleen's father in the days before his death and participated in his funeral. Warholak's sons by a prior marriage referred to Cathleen as "Mama Quinn" and slept in rooms reserved for them when they visited their father in Cathleen's home.

Furthermore, Cathleen continued to cohabit with Warholak after David filed the motion to terminate alimony and still cohabited with him when the trial commenced. This record presents a situation no different from a remarriage that terminates by death or divorce. In light of the parties' agreement that alimony would terminate upon cohabitation, the circumstances here do not call for a different result.

It bears repeating that the cohabitation provision of a PSA must be voluntary, knowing and consensual to permit enforcement of the provision. Id. at 203. The trial court findings demonstrate that this cohabitation provision satisfies the criteria for enforcement. Cathleen testified that she knowingly and voluntarily agreed to the terms of the agreement governing termination of alimony. She knew what conduct would be considered cohabitation. She knew that she would forego her alimony if she cohabited and David moved to enforce the cohabitation provision.

Significantly, Cathleen was represented by independent counsel when the PSA was negotiated and executed. She alleged

22

no improprieties and suggested no fraud, overreaching, or coercion. Cathleen's sole defense was that her romantic relationship with Warholak should not be considered cohabitation. Although we acknowledge that the trial court had a duty to supervise David's invocation of his right to terminate his alimony obligation, having found that Cathleen had cohabited for an extended period of time, the trial court had no basis to fashion a remedy short of the one agreed to by the parties.

This is not a case in which there is a missing term required to effectuate a provision of the agreement, as in Sachau. It is not a case in which one party has overreached or has received inadequate representation, as in Guglielmo. And it is not a case in which the parties contend that a critical term was understood at the time, but later each party reveals that they held a different understanding of the provision at the time of agreement, as in Pacifico. Rather, this is a case in which the parties' testimony and the trial court's findings reveal that each party understood the events that would trigger termination of alimony and the meaning of the critical term in this appeal -- cohabitation.

The remedy fashioned by the trial court and affirmed by the Appellate Division created an agreement different from the one to which the Quinns agreed. The judicial remedy ignored the certitude provided by their settlement, or indeed any

23

settlement, which obtained the result desired by all parties --
the amicable resolution of disputes fashioned by the litigants
to meet their particular needs.

Finally, we reject the suggestion that enforcement of this
cohabitation agreement permits a former spouse to control the
post-marital conduct of the other spouse.  Such a contention
misconstrues the purpose of identifying cohabitation as an
alimony-termination event and also misconstrues this record.
When parties to a matrimonial settlement agreement have agreed
to permit termination of alimony on remarriage or cohabitation,
they have recognized that each are equivalent events.  In each
situation the couple has formed an enduring and committed
relationship.  In each situation, the couple has combined forces
to mutually comfort and assist the other.  The only distinction
between remarriage and cohabitation is a license and the
recitation of vows in the presence of others.  When the facts
support no conclusion other than that the relationship has all
the hallmarks of a marriage, the lack of official recognition
offers no principled basis to treat cohabitation differently
from remarriage as an alimony-terminating event.

We do not today suggest that a romantic relationship
between an alimony recipient and another, characterized by
regular meetings, participation in mutually appreciated
activities, and some overnight stays in the home of one or the

24

other, rises to the level of cohabitation.  We agree that this level of control over a former spouse would be unwarranted and might violate the no-obligation clause found in many divorce agreements.[4]  However, the romantic relationship described above is not the long-term relationship presented in this voluminous record.

Our dissenting colleagues highlight the financial consequences of this decision to Cathleen.  To be sure, those consequences are serious.  Yet the record demonstrates that she knew that cohabitation would risk the loss of her primary source of income and, recognizing the consequences, she proceeded to cohabit with Warholak.  She, not the Court or her former husband, exacerbated her financial situation by quitting her job and fashioning a defense that was found baseless by the trial court.

We also cannot subscribe to the view advanced by our dissenting colleagues that applying the <u>Gayet</u> economic reliance or dependence rule is somehow less intrusive in the personal life of the former spouse.  There are few exercises more intrusive than the need to identify every expenditure and the source of the funds for each expenditure.  Such an inquiry

---

[4]  For example, the parties' PSA states that, except as otherwise provided, "the parties shall and do hereby mutually remise, release and forever discharge each other from any and all suits, actions, debts, claims, demands, and obligations whatsoever[.]"

reveals a vast amount of personal information about the daily life of the former spouse that is of no concern to the obligor spouse. Moreover, sixteen years ago in Konzelman, this Court declined to import the Gayet economic dependence or reliance rule when the parties have agreed in a marital settlement agreement that cohabitation is an alimony-termination event. We discern no basis to depart from that determination.

V.

In sum, we reiterate today that an agreement to terminate alimony upon cohabitation entered by fully informed parties, represented by independent counsel, and without any evidence of overreaching, fraud, or coercion is enforceable. It is irrelevant that the cohabitation ceased during trial when that relationship had existed for a considerable period of time. Under those circumstances, when a judge finds that the spouse receiving alimony has cohabited, the obligor spouse is entitled to full enforcement of the parties' agreement. When a court alters an agreement in the absence of a compelling reason, the court eviscerates the certitude the parties thought they had secured, and in the long run undermines this Court's preference for settlement of all, including marital, disputes. Here, there were no compelling reasons to depart from the clear, unambiguous, and mutually understood terms of the PSA. We therefore reverse the judgment of the Appellate Division.

VI.

The judgment of the Appellate Division is reversed.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in JUDGE CUFF's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which JUSTICE LaVECCHIA joins. JUSTICE FERNANDEZ-VINA did not participate.

CATHLEEN QUINN,

    Plaintiff-Respondent,

      v.

DAVID J. QUINN,

    Defendant-Appellant.

Albin, J., dissenting.

A property settlement agreement in a divorce action should address the economic consequences of a marriage's dissolution; it should not contain senseless shackles that deprive a spouse of the right to seek love and companionship. An ex-husband should not be empowered through a property settlement agreement to threaten his ex-wife with the termination of her alimony if she cohabits with another person, when the living arrangement does not change her financial circumstances. Anti-cohabitation clauses unrelated to the economic standing of an ex-spouse should be contrary to public policy because they serve no purpose other than as instruments of oppression.

Marriage, in part, is an economic partnership, and in many cases one spouse may have subordinated her earning potential or career for the greater good of the family and the financial success of the other spouse. Alimony is a right that assures

1

the divorced spouse that she can maintain the lifestyle that she enjoyed while married.  Although the right to alimony is available to all ex-spouses, regardless of gender, the reality is that women are overwhelmingly the ones dependent on alimony.

"The private lives of divorced women are no business of the law" when their personal relationships have not enhanced their economic standing.  Konzelman v. Konzelman, 158 N.J. 185, 204 (1999)(O'Hern, J., dissenting).  If an ex-husband cannot be constrained from pursuing a loving or romantic relationship, then why should an ex-wife be constrained from pursuing happiness by the hold of an anti-cohabitation clause untethered to changed economic circumstances?  It is not enough to say that a contract is a contract when, as here, a provision is contrary to public policy.

The majority's enforcement of the anti-cohabitation clause in this case will pauperize the ex-wife and probably leave her dependent on public assistance while her ex-husband enjoys the fruits of his affluence made possible by her marital sacrifices.  Because I cannot agree to this miscarriage of justice, I respectfully dissent.

I.

Cathleen and David Quinn were married for twenty-two years before their divorce in 2006.  During their marriage, they raised two children, a daughter and son, who at the time of the

2

divorce were nineteen and sixteen years old. Cathleen asserted that David "ascended the corporate ladder for twenty years while [Cathleen] was the homemaker taking care of the family." At the time of the divorce, David earned a salary that exceeded $200,000 a year, while Cathleen earned a little more than $20,000 a year. The minor son continued to live with his mother after his parents' separation.

Cathleen and David entered into a property settlement agreement that was incorporated into a judgment of divorce. The agreement provided that Cathleen would receive permanent alimony in the amount of approximately $72,000 per year. Additionally, the agreement provided that "alimony shall terminate upon the Wife's death, the Husband's death, the Wife's remarriage, or the Wife's cohabitation, per case or statutory law, whichever event shall first occur." (Emphasis added). The agreement did not exact a penalty if David cohabited.

In 2007, Cathleen began a romantic relationship with John Warholak. Although Warholak lived at Cathleen's home from January 2008 until April 2010, there is no evidence that Warholak financially supported Cathleen. Cathleen's relationship with Warholak ended shortly after David filed a motion for termination of alimony based on Cathleen's cohabitation. David, who was earning more than $250,000 per

year at the time, did not argue that he could not afford to continue making alimony payments.

The family court conducted a hearing on David's motion and determined that Cathleen had cohabited for a period of twenty-eight months. The Court ordered that Cathleen pay back the $169,806 in alimony payments that she had received during the cohabitation period and reimburse David for $145,536.74 in attorneys' fees. The total amount due, $315,342.74, was to be deducted from Cathleen's continued alimony payments by reducing those payments by one half until the judgment was paid.

The Appellate Division affirmed, and now this Court reverses. The majority holds that Cathleen's violation of the anti-cohabitation clause required the irrevocable termination of her alimony, backdated to January 2008. The majority affirms the family court's order that Cathleen is responsible for David's attorneys' fees. As a result of the majority's decision, Cathleen will no longer receive alimony and is obligated to pay David $315,342.74 from her salary of approximately $20,000 per year. The ruling leaves Cathleen destitute and a good candidate for public assistance.[1]

---

[1] While the poverty level for a single individual is $11,880 per year, see Federal Poverty Level, HealthCare.gov, https://www.healthcare.gov/glossary/federal-poverty-level-FPL/, New Jersey residents may for example, qualify for supplemental nutritional assistance at an income of $21,978, see General Assistance (WorkFirst NJ), State of New Jersey, Department of

The majority reaches this unjust result by its adherence to the a-contract-is-a-contract doctrine.  But a contractual provision that is contrary to public policy is unenforceable.  A spouse has no legitimate reason to condition the receipt of alimony on an ex-spouse not cohabiting with someone whom she loves, when the economic circumstances of the ex-spouse remain unchanged.  The public interest is not advanced by giving a spouse the ability to control or intrude into the intimate affairs of his ex-spouse.  The law should not encourage a spouse to trail or spy on an ex-spouse, or to hire investigators to do so, to gain some unwarranted financial benefit.[2]  Nor should a court stand in the way of an ex-spouse pursuing happiness or authorize the forfeiture of alimony earned over many years of marriage, such as in the circumstances presented here.

A brief review of the relevant case law will show how we have reached the current state of our jurisprudence.

## II.

"Alimony is an 'economic right that arises out of the marital relationship and provides the dependent spouse with "a level of support and standard of living generally commensurate

---

Human Services, Division of Family Development, http://www.state.nj.us/humanservices/dfd/programs/assistance/.

[2] In Konzelman, supra, a private investigator watched a "residence seven days a week for 127 days" to determine whether a divorced wife cohabited with an unrelated male.  158 N.J. at 191.

with the quality of economic life that existed during the marriage."'" Quinn v. Quinn, __ N.J. __, __ (2016) (slip op. at 16)(quoting Mani v. Mani, 183 N.J. 70, 80 (2005)). Alimony is a right earned by a spouse, often by personal sacrifices made so that the other spouse can pursue a career and enhanced earning power. See Mahoney v. Mahoney, 91 N.J. 488, 500-01 (1982). Alimony can be modified when the economic circumstances of the parties change, see N.J.S.A. 2A:34-23(c), but cannot be extinguished for reasons contrary to public policy, see Petersen v. Petersen, 85 N.J. 638, 642, 646 (1981) (indicating that alimony and support agreements between spouses that are unfair and unjust are not enforceable in equity).

In Gayet v. Gayet, 92 N.J. 149 (1983), this Court held that a husband -- ordered to pay alimony as part of a divorce decree -- was not entitled to a modification of his alimony merely because his ex-wife cohabited with an individual. Traditionally, "the test for modification of alimony is whether the relationship has reduced the financial needs of the dependent former spouse." Id. at 150. The Court adopted an economic-needs test to determine whether an alimony award should be modified as a result of cohabitation. Id. at 153-54. Thus, a modification of alimony based on changed circumstances for cohabitation is permitted "only if one cohabitant supports or subsidizes the other under circumstances sufficient to entitle

6

the supporting spouse to relief." Ibid. That approach, the Court concluded, "best balances the interests of personal freedom and economic support and comports with the principles of" our jurisprudence and statutory law. Id. at 154. The Court recognized that "[t]he extent of actual economic dependency, not one's conduct as a cohabitant, must determine the duration of support as well as its amount." Ibid.

In Konzelman v. Konzelman, 158 N.J. 185 (1999), the Court took a wrong turn when it concluded that the parties could contract away the fundamental principles animating Gayet. The Court in Konzelman enforced a provision in a property settlement agreement that conditioned the receipt of alimony on an ex-wife not cohabiting with an unrelated male. Id. at 191, 203. The anti-cohabitation clause was upheld despite the absence of any change in the economic circumstances of the ex-wife. Id. at 196. Anti-cohabitation clauses under Konzelman permit the forfeiture of the right to alimony even if the cohabiting ex-spouse receives no financial support from the person with whom she resides. Ibid.

In a dissent joined by Justice Stein, Justice O'Hern correctly concluded that Konzelman abandoned Gayet's financial-needs test, encouraged unwarranted interference in the personal affairs of the ex-wife, and exalted the right to contract above

7

public policy.  See id. at 204, 209 (O'Hern, J. dissenting).[3]  In explaining the wrongness of the Konzelman decision, Justice O'Hern made the following points.  Legitimizing an anti-cohabitation clause untethered to a change in economic circumstances (1) permits a spouse "to exert unjust and inappropriate control over the [alimony] recipient's personal life"; (2) allows money to be used as a negotiating tool to "buy a woman's right to choose her companions"; and (3) "force[s] attorneys and parties to bargain over the fair value" of a clause that has no purpose other than "to retain control over the divorced spouse."  Id. at 206-07, 210.

Justice O'Hern noted that economic need and dependency underpins an alimony obligation.  Id. at 208.  He concluded that it was "manifestly unfair to relieve Mr. Konzelman of all alimony obligations based upon Mrs. Konzelman's choice of companionship with another man," without requiring him to demonstrate that his ex-wife's "financial status is any better because of her new relationship."  Id. at 208-09.  He lamented that the majority ruling in Konzelman would result in "tasteless inquiries into the private lives of divorced women."  Id. at 210.  Justice O'Hern observed that enforcement of the anti-cohabitation clause permitted Mr. Konzelman "to reap the

---

[3] Justice O'Hern authored Gayet.

8

benefits of an increased earning capacity built up during the marriage" while "casting [his] partner of twenty-seven years into poverty" for the "sin" of entering into a loving relationship with another man.  Id. at 209.

Justice O'Hern's discerning dissent spoke to the realities of his day, and our day, and of a court's obligation not to enforce an unreasonable, unfair, and overbearing provision of a property settlement agreement.  Stare decisis is an important doctrine to promote stability in our jurisprudence, but it is not a command to perpetuate the mistakes of the past when the wrongness of a past decision is revealed in the fullness of time.  See Lawrence v. Texas, 539 U.S. 558, 577, 123 S. Ct. 2472, 2483, 156 L. Ed. 2d 508, 525 (2003).

III.

A.

The family court is a court of equity, and yet the majority approves the use of an anti-cohabitation clause as a means to oppress an ex-spouse.  During twenty-two years of marriage, Cathleen contributed to David's ability to advance his career and increase his earning capacity.  No rational public policy is furthered by forcing Cathleen to choose between her right to economic support by her ex-husband and her desire to enter into a meaningful and loving relationship.  The majority not only terminates all of Cathleen's support by ordering a forfeiture of

9

her alimony, but also directs her to pay her affluent husband over $300,000, approximately thirteen times her annual salary. This absurd and ruinous result that pauperizes her is the antithesis of equity.

B.

Although matrimonial agreements are governed by basic contract principles, Pacifico v. Pacifico, 190 N.J. 258, 265-66 (2007), contractual provisions that are contrary to public policy are unenforceable, Marcinczyk v. State of New Jersey Police Training Comm'n, 203 N.J. 586, 594 (2010), even when those provisions are contained in a property settlement agreement, Petersen, supra, 85 N.J. at 640, 646. In Petersen, we held that a property settlement agreement providing for an automatic escalation of alimony and support payments based on an increase in a husband's net income would be unenforceable absent a determination that, despite changed circumstances, "the enforcement of those terms would be fair, just and equitable." Ibid. Additionally, in Giangeruso v. Giangeruso, 310 N.J. Super. 476, 477 (App. Div. 1997), the Appellate Division declared void as against public policy a clause in a property settlement agreement in which the parties stipulated "that the children shall not have any contact with any girlfriend/boyfriend or love interest of the other if the children express reluctance to do so."

10

It is clear that the right to contract does not reign supreme in family matters and that the greater good must prevail over the schemes and designs of a party or parties when a contractual provision offends public policy. The family court, in particular, is invested with equitable powers to ensure that individual rights are not trampled by oppressive contractual clauses that serve no legitimate purpose. See Petersen, supra, 85 N.J. at 644-46. Among the "unalienable rights" guaranteed in the first article and paragraph of the New Jersey Constitution is the right to pursue "happiness." N.J. Const. art. I, ¶ 1. The contractual provision in this case empowers an ex-husband to compel his former wife to choose between continuing a loving relationship and maintaining her earned right to alimony, even when her new relationship has not changed her economic circumstances.

The hardship and unfairness caused by today's decision will be disproportionately borne by divorced women who, by an overwhelming number compared to men, are dependent on alimony for their support.[4]

---

[4] According to the United States Census Bureau, in the 2010 census, of the 392,000 people in the nation who listed alimony as a source of income, 380,000 were women. See Current Population Survey, Source of Income in 2010-Number with Income and Mean Income of Specified Type in 2010 of People 15 Years Old and Over by Age, Race, and Hispanic Origin, and Sex, Both Sexes, http://www.census.gov/hhes/www/cpstables/032011/perinc/new09_001 .htm; Current Population Survey, Source of Income in 2010-Number

11

C.

Finally, the majority errs in suggesting that cohabitation and marriage are or should be equivalent under the law. See Quinn, supra, __ N.J. at __ (slip op. at 24). Marriage is more than a solemn exchange of vows. The law confers on married couples -- not cohabiting partners -- considerable economic and other benefits. See, e.g., N.J.S.A. 2A:84A-22 (marital privilege limited to spouse or civil union partner); N.J.S.A. 3B:5-3 (spouse eligible for share of intestate estate); N.J.S.A. 3B:5-15 (spouse or domestic partner has right to intestate share of decedent's estate when decedent's will written before marriage or domestic partnership); N.J.S.A. 3B:8-1 (only surviving spouses and domestic partners qualify for right to elective share of decedent's estate); N.J.S.A. 18A:62-25 (spouse of member of New Jersey National Guard killed while performing duties eligible for post-secondary education tuition benefits); N.J.S.A. 18A:71-78.1 (spouse of volunteer firefighter eligible for post-secondary education tuition benefits); N.J.S.A. 34:11-4.5 (wages due to deceased employee may be paid to spouse); N.J.S.A 34:11B-3(j) (defining family member as "a child, parent,

with Income and Mean Income of Specified Type in 2010 of People 15 Years Old and Over by Age, Race, and Hispanic Origin, and Sex, Females, http://www.census.gov/hhes/www/cpstables/032011/perinc/new09_013 .htm.

spouse, or one partner in a civil union couple" for purposes of Family Leave Act); N.J.S.A. 34:15-13 (spouse of deceased eligible for death benefits under workers compensation law); N.J.S.A. 46:3-17.2 (spouses may hold property by tenancy by entirety); N.J.S.A. 46:15-10 (spouses exempt from realty transfer fee); N.J.S.A. 54A:2-1(a) (determination of taxable income affected by marital status); N.J.S.A. 54A:3-3 (spouse's medical expenses may be partially deducted from taxable gross income). Cf. United States v. Windsor, __ U.S. __, __, 133 S. Ct. 2675, 2694, 186 L. Ed. 2d 808, 828-29 (2013) (noting that married couples are entitled to specific government healthcare benefits, to special protections for domestic-support obligations under the Bankruptcy Code, and to file their state and federal taxes jointly).

Additionally, by its recent amendments to the alimony statute, N.J.S.A. 2A:34-23, the Legislature has signaled that it did not intend to conflate cohabitation with marriage. The new statute provides that "[a]limony may be suspended or terminated if the payee cohabits with another person." N.J.S.A. 2A:34-23(n) (emphasis added). In contrast, when "a former spouse shall remarry . . . permanent and limited duration alimony shall terminate as of the date of remarriage." N.J.S.A. 23:34-25 (emphasis added).

The permissive language in N.J.S.A. 2A:34-23(n) -- unlike the mandatory language in N.J.S.A. 2A:34-25 -- indicates that the Legislature did not intend alimony to terminate, or even be modified, automatically in the event of cohabitation. The permissive language requires our family courts to equitably exercise discretion. In doing so, undoubtedly, in the absence of a property settlement agreement, our courts will look to the guiding principles of Gayet's economic-needs test. Clearly, the Legislature intended courts to treat marriage and cohabitation differently in determining when to terminate or modify alimony.

IV.

The majority in this case has reached not the inevitable, but the inequitable result. The majority's adherence to Konzelman has led to an unjust outcome in this case. We are not bound to follow a decision whose principles are unsound and when considered reflection counsels that we should take a different, more just course. The passage of time has not dimmed the logical force of Justice O'Hern's dissent in Konzelman. Denying a divorced woman her right to alimony merely because she has pursued happiness and cohabits advances no legitimate interest when her economic circumstances remain unchanged. The wrong here is not made right because the anti-cohabitation clause is contained in a property settlement agreement.

14

I would hold that an anti-cohabitation clause, untethered to economic needs, is contrary to public policy and unenforceable.  I therefore respectfully dissent.

SUPREME COURT OF NEW JERSEY

NO. __A-5____                        SEPTEMBER TERM 2014
ON CERTIFICATION TO __Appellate Division, Superior Court_____


CATHLEEN QUINN,

        Plaintiff-Respondent,

              v.

DAVID J. QUINN,

        Defendant-Appellant.


DECIDED _____May 3, 2016_____
                Chief Justice Rabner                    PRESIDING
OPINION BY _____Judge Cuff (temporarily assigned)_____
CONCURRING/DISSENTING OPINION BY_____
DISSENTING OPINION BY ____Justice Albin_____


| CHECKLIST | REVERSE | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | | X |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | ----------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 4 | 2 |