**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0433-20

A.W.,[1]

     Plaintiff-Respondent,

v.

A.C.W.,

     Defendant-Appellant.

_____

         Submitted December 13, 2021 – Decided January 4, 2022

         Before Judges Fasciale and Firko.

         On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FM-11-0373-17.

         Matthew B. Lun, attorney for appellant.

         Pellettieri Rabstein & Altman, attorneys for respondent (John A. Hartmann, III, of counsel; Jillian Frost Kalyan, on the brief).

---

[1] We use initials to identify the parties and third party to protect and preserve the confidentiality of these proceedings.

PER CURIAM

In this post-judgment matrimonial matter, defendant A.C.W. appeals from an August 28, 2020 Family Part order denying, without prejudice, his motion to terminate his ten-year limited duration alimony (LDA) and related obligations to plaintiff A.W. based on changed circumstances and her alleged cohabitation with E.S. under N.J.S.A. 2A:34-23(n). Defendant contends he established a prima facie case of changed circumstances and cohabitation warranting discovery and a plenary hearing. The judge denied plaintiff's notice of cross-motion insofar as it sought an award of counsel fees and costs. We have considered these arguments in light of the record and affirm.

## I.

We derive the facts from the record. After nearly twenty-seven years of marriage, the parties divorced on October 10, 2017, pursuant to a final judgment of divorce (FJOD). They had no children. A previously negotiated agreement was placed orally on the record and incorporated into the FJOD. In part, defendant agreed to: (1) pay LDA to plaintiff of $1,800 per month for a period of ten years; (2) maintain life insurance naming plaintiff as his sole beneficiary to secure the alimony obligation; and (3) contribute $5,000 towards plaintiff's counsel fees. Defendant waived any equitable distribution interest claim to the

parties' former marital home and plaintiff's business, Café Vienna, which was located in Princeton. Plaintiff agreed to pay the parties' joint credit card debt, approximately $17,000, and waived any claim to defendant's retirement accounts. When the FJOD was entered, defendant owned an IRA valued at approximately $93,000 and a 401(k) plan valued at approximately $126,000.

Notably, the parties' agreement and FJOD are "silent as to the circumstances of the parties at the time . . . [and] marital standard of living." Specifically, the FJOD did not address the parties' incomes, lifestyles, or liabilities, or individual liabilities or circumstances permitting modification or termination of defendant's alimony and related obligations.

In July 2018, plaintiff sold Café Vienna for $115,000 because she was unable to keep up with an increasing demand in business "due to outdated electrical, water, and other systems in the building." From the $115,000 gross proceeds, plaintiff owed the following debts, stated in appropriate amounts: (1) $23,000 in taxes and penalties to the State; (2) $40,000 on an outstanding business loan; and (3) $36,000 in unpaid payroll taxes, with $24,000 still due and owing. Plaintiff certified she used the remaining proceeds to support herself while she "looked for work over the next year." At this time, plaintiff "was

3

A-0433-20

almost [fifty-nine] years old and had not been employed in any capacity for more than five years."

Ultimately, plaintiff's childhood friend E.S. offered her part-time employment as an office manager for his family business, E+MSA, in Austria. E+MSA certifies "real property for energy compliance." According to plaintiff, she and E.S. became close friends when she was a teenager, and the two remained "pen pals as adults." Plaintiff accepted E.S.'s offer of employment and moved to Austria with the funds remaining from the sale of Café Vienna. E.S. traveled to the United States to help her move.

Currently, plaintiff earns between $727 and $938 per month. Her compensation includes use of a company vehicle. Plaintiff is responsible for paying the vehicle's expenses, including insurance, maintenance, and fuel. She also pays for her own apartment, "unit two," located in Sankt Veit an der Glan, located down the hall from an apartment, "unit one," leased by E.S. According to E.S., unit one is not his registered home address. Plaintiff certified E.S. has used unit one "in some capacity, either personally or for business purposes, at various times since 2017."

Following the parties' divorce, defendant "repeatedly asked [plaintiff] to agree to terminate alimony," but she refused. Thereafter, defendant retained

4

Pro-Investigators to investigate and conduct surveillance on plaintiff and E.S. The investigation began on April 2, 2020, and concluded less than two weeks later on April 13, 2020. During that time span, Pro-Investigators reported plaintiff and E.S. were "together for all nine of the nine days they were observed" and "all seven of the seven nights they were observed." They entered plaintiff's apartment together and did not leave until the next morning. Additionally, plaintiff and E.S. were observed by the investigator "shop[ping] for groceries together, visit[ing] family together," and traveling to and from work together.

On July 2, 2020[2], defendant filed a notice of motion seeking to terminate his alimony obligations to plaintiff or, alternatively, to set forth a discovery schedule and conduct a plenary hearing to address plaintiff's earning capacity. On August 13, 2020, plaintiff filed a notice of cross-motion seeking to deny defendant's motion and to compel him to provide proof of life insurance.[3] Both parties sought counsel fees and costs.

---

[2] Plaintiff mistakenly claims the date was July 3 in her brief.

[3] Defendant provided proof of life insurance in his August 20, 2020 reply certification, thereby rendering this aspect of plaintiff's cross-motion moot.

A-0433-20

On August 28, 2020, the judge heard oral argument. During oral argument, defendant claimed E.S. is plaintiff's boyfriend and had "asked her to come to Austria [to] live with him." In opposition, plaintiff claimed E.S. is just "a longtime friend[] [who] offered her employment[] [when] [s]he couldn't find work." On the same date, following oral arguments of counsel, the judge rendered an oral opinion denying defendant's motion, without prejudice, and denying plaintiff's cross-motion for counsel fees and costs. The judge analyzed defendant's motion by applying the New Jersey alimony statute's enumerated factors.[4]

As to the first two factors, the judge found there was "[in]sufficient evidence based upon the investigator's report that would demonstrate . . . [plaintiff and E.S.] had intertwined finances [or] joint responsibility for living expenses." And, the judge stressed "the investigator's report really misse[d] the mark," because "there were two apartments. It's an apartment building" and "plaintiff has her own separate apartment." Nor did the judge find "evidence of recognition of the relationship," pursuant to the third factor. Furthermore, the

---

[4] The six factors are: (1) intertwined finances; (2) shared living expenses; (3) recognition of the relationship in the couple's social and family circles; (4) frequency of contact and duration of relationship; (5) shared household chores; (6) enforceable promises of support; and (7) all other relevant evidence. N.J.S.A. 21:34-23(n).

A-0433-20

judge noted there was no evidence of plaintiff and E.S. traveling together in "social circles," or of the "couple" on social media.

In regard to the fourth factor, frequency of contact, the judge found defendant's surveillance of nine days "primarily focused on the fact that [plaintiff and E.S.] entered the [apartment] building at the same time and did not exit."[5] The judge found plaintiff's explanation to be "entirely reasonable" because: (1) E.S. had asked plaintiff to come to Austria, his domicile, and E.S. had offered plaintiff employment, which she accepted; and (2) although plaintiff and E.S. live in the same apartment building "she "has her own separate apartment [from E.S.]." Additionally, even though plaintiff commutes daily with E.S. to and from work, and on occasion drives E.S.'s personal car, plaintiff "can't get her own automobile as she has to live in Austria at least for a year and maybe [fulfill] some other requirements [to get one]." With regard to the pandemic, the judge emphasized:

> [W]hen the investigator was taking these photographs in April of 2020[,] Austria had, for want of a better term, a stay-at-home order . . . due to the [COVID-19] pandemic.
>
> And so [plaintiff has] explain[ed] there's a reason why they go in together and nobody comes out for a

---

[5] Although the investigation spanned twelve days, the investigator only surveilled plaintiff and E.S. for nine days.

A-0433-20

day. [However,] the investigator gratuitously has in his report, [that] they spent the night together. And . . . [I] . . . question[ed] the investigator's language and the assumption that they were spending the night together.

[T]here's absolutely no proof from the investigator that at the end of the work day or maybe at the end of dinner, when they had dinner together because of [COVID 19], [and] everybody was stuck in the same building, apartment complex, that she [did not] just [go] into her unit at the end of the day. Both [plaintiff] and [E.S.] are smokers, so there [a]re pictures of them smoking cigarettes on the balcony.

[But] that really doesn't prove [cohabitation] . . . .

Based on the evidence, the judge found plaintiff's explanation was "entirely reasonable considering [p]laintiff and [E.S.] occupy apartments down the hall from each other in the same building."

As to the fifth factor, the judge found "[t]here was no proof of [plaintiff and E.S.] sharing household chores," noting if any grocery shopping was done by them together, it was not "jointly as a boyfriend and girlfriend." No evidence of an enforceable promise was demonstrated as to factor six. The judge denied defendant's motion to terminate alimony based upon changed circumstances and cohabitation without prejudice and denied both parties' requests for counsel fees and costs. This appeal followed.

A-0433-20

On appeal, defendant argues issues of material fact raised by plaintiff's sale of Café Vienna and relocation to Austria were sufficient to warrant a plenary hearing. We disagree and affirm substantially for the reasons expressed by the Family Part judge. We add the following remarks.

II.

We first consider the well-settled principles that guide our review. Alimony is an economic right, which "arises out of the marital relationship and provides the dependent spouse with 'a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage.'" Quinn v. Quinn, 225 N.J. 34, 48 (2016) (quoting Mani v. Mani, 183 N.J. 70, 80 (2005)). "The basic purpose of alimony is the continuation of the standard of living enjoyed by the parties prior to their separation." Innes v. Innes, 117 N.J. 496, 503 (1990) (citing Mahoney v. Mahoney, 91 N.J. 488, 501-02 (1982)). Thus, alimony permits a dependent "spouse to share in the accumulated marital assets to which he or she contributed." Konzelman v. Konzelman, 158 N.J. 185, 195 (1999) (citing Mahoney, 91 N.J. at 500-01).

Our scope of review of the trial court's decision is limited. "Whether an alimony obligation should be modified based upon a claim of changed circumstances rests within a Family Part judge's sound discretion." Larbig v.

Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006). Each individual motion for modification is particularized to the facts of that case, "and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters." Ibid. (quoting Martindell v. Martindell, 21 N.J. 341, 355 (1956)). We will not disturb the trial court's decision on alimony unless we:

> conclude that the trial court clearly abused its discretion, failed to consider all of the controlling legal principles, or must otherwise be well satisfied that the findings were mistaken or that the determination could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole.
>
> [Heinl v. Heinl, 287 N.J. Super. 337, 345 (App. Div. 1996) (citing Rolnick v. Rolnick, 262 N.J. Super. 343, 360 (App. Div. 1993)).]

Alimony "may be revised and altered by the court from time to time as circumstances may require." N.J.S.A. 2A:34-23. To make such a modification, "a showing of 'changed circumstances'" is required. See Lepis v. Lepis, 83 N.J. 139, 146 (1980); see also Weishaus v. Weishaus, 180 N.J. 131, 141 (2004) (citations omitted).

10

Changed Circumstances

First, defendant argues that "[p]laintiff's decision to sell [Café Vienna] represents a change in circumstances," because she was capable of "earn[ing] an income sufficient for her to maintain the martial standard of living without alimony from [d]efendant." According to defendant, "plaintiff enjoyed a higher earning capacity throughout the marriage and, with [Café Vienna] having been sold, she could return to that level of employment." Hence, defendant claims "[i]n light of [p]laintiff's demonstrated capacity to earn nearly $150,000 annually for many years, her earning capacity following the sale of the café presents a genuine issue of material fact."

A changed circumstance may include both "an increase or decrease in the income of the supporting or supported spouse." Quinn, 225 N.J. at 49 (quoting J.B. v. W.B., 215 N.J. 305, 327 (2013)). Changed circumstances applies equally to "where there has been a significant change for the better in the circumstances of the dependent spouse as where there has been a significant change for the worse in the [supporting spouse]'s own circumstances." Stamberg v. Stamberg, 302 N.J. Super. 35, 42 (App. Div. 1997) (emphasis added) (citing Aronson v. Aronson, 245 N.J. Super. 354, 364 (App. Div. 1991)).

11

A moving party "may make a prima facie showing of changed circumstances . . . by citing a combination of changes . . . of both parties[,] which together have altered the status quo [that] existed at the time of the entry of the support order under review." Donnelly v. Donnelly, 405 N.J. Super. 117, 131 (App. Div. 2009) (quoting Stamberg, 302 N.J. Super. at 42). "[T]he changed-circumstances determination must be made by comparing the parties' financial circumstances at the time the motion for relief is made with the circumstances which formed the basis for the last order fixing support obligations." Beck v. Beck, 239 N.J. Super. 183, 190 (App. Div. 1990).

A moving party arguing a change for the worse in his or her own circumstances must show specifically "that changed circumstances have substantially impaired [their] ability to support himself or herself." Crews v. Crews, 164 N.J. 11, 28 (2000) (quoting Lepis, 83 N.J. at 157). This standard "must be understood to mean the ability to maintain a standard of living reasonably comparable to the standard enjoyed during the marriage." Ibid. A temporary reduction will not suffice. Innes, 117 N.J. at 504 (citing Bonanno v. Bonanno, 4 N.J. .268, 275 (1950)).

A-0433-20

Here, the record shows defendant has maintained a reasonably comparable standard of living as he enjoyed during the parties' marriage.[6] Defendant's taxed Medicare earnings reflect he earned $196,000 in 2019, even though defendant asserts that "2019 was an odd year," which presented significant opportunities for overtime. He also certified such "overtime [was] no longer available" and his expected earnings for 2020 were only $149,000. In contrast, in 2016, the year plaintiff filed for divorce, defendant earned $112,485. Thus, even after crediting defendant's yearly alimony obligation, his post-judgment income has exceeded his earnings during the parties' marriage and does not include his alternative potential to generate income. See Miller v. Miller, 160 N.J. 408, 420-21 (1999) (quoting Innes, 117 N.J. at 503). Plaintiff's economic situation has not improved since the FJOD was entered. Therefore, we reject defendant's argument that changed circumstances have been established. Stamberg, 302 N.J. Super. at 42; see, e.g., Lepis, 83 N.J. at 151 (indicating post-divorce employment by a previously unemployed dependent spouse would constitute changed circumstances).

---

[6] Defendant has not specifically argued a change in his own financial circumstances.

A-0433-20

Cohabitation

Turning now to the issue of cohabitation, in <u>Landau v. Landau</u>, 461 N.J. Super. 107, 108 (App. Div. 2019), we held that "the changed circumstances standard of [<u>Lepis</u>] continues to apply to a motion to suspend or terminate alimony based on cohabitation following the 2014 amendments to the alimony statute, N.J.S.A. 2A:34-23(n)." Those amendments defined cohabitation as "involv[ing] a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household." N.J.S.A. 2A:34-23(n). To determine whether there is a prima facie showing of changed circumstances, the court must consider the terms of the order at issue and compare the facts as they existed when the order was entered with the facts at the time of the motion. <u>See, e.g.</u>, <u>Quinn</u>, 225 N.J. at 45-46.

A prima facie showing of cohabitation constitutes sufficient changed circumstances under <u>Lepis</u>. <u>Gayet v. Gayet</u>, 92 N.J. 149, 154-55 (1983). Cohabitation has been defined as "an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage." <u>Konzelman</u>, 158 N.J. at 202. Where a supporting spouse seeks to decrease or terminate alimony because of the dependent spouse's cohabitation,

"the test for modification of alimony is whether the relationship has reduced the financial needs of the dependent former spouse." Gayet, 92 N.J. at 149-50. Alimony may be modified "when (1) the third party contributes to the dependent spouse's support, or (2) the third party resides in the dependent spouse's home without contributing anything toward the household expenses." Id. at 153 (citing Garlinger v. Garlinger, 137 N.J. Super. 56,64 (App. Div. 1975)).

"[A] showing of cohabitation creates a rebuttable presumption of changed circumstances shifting the burden to the dependent spouse to show that there is no actual economic benefit to the spouse or the cohabitant." Reese v. Weis, 430 N.J. Super. 552, 570 (App. Div. 2013) (quoting Ozolins v. Ozolins, 308 N.J. Super. 243, 248 (App. Div. 1998)). The court must focus on the cohabitant's economic relationship to discern "whether one . . . 'subsidizes the other.'" Id. at 571 (quoting Boardman v. Boardman, 314 N.J. Super. 340, 347 (App. Div. 1998)). Whether this economic benefit exists requires a fact-intensive inquiry by the trial judge. Id. at 576.

Prior to the Legislature's adoption of the 2014 amendments, the legal criteria for cohabitation were not specified by statute but instead embodied in case law. See generally, Konzelman, 158 N.J. at 195-203. As the Supreme Court explained in Konzelman, cohabitation is typified by the existence of a

marriage-like relationship "shown to have stability, permanency[,] and mutual interdependence." Id. at 202; see also Reese, 430 N.J. Super. at 570 (similarly noting that "[c]ohabitation involves an 'intimate[,]' 'close and enduring' relationship, requiring 'more than a common residence' or mere sexual liaison" (second alteration in original) (quoting Konzelman, 158 N.J. at 202)).

Although "living together, intertwined finances such as joint bank accounts, sharing living expenses and household chores, and recognition of the relationship in the couple's social and family circle" may support a finding of cohabitation, such illustrative examples must not be considered in a vacuum. Konzelman, 158 N.J. at 202. "A mere romantic, casual[,] or social relationship is not sufficient to justify the enforcement of a settlement agreement provision terminating alimony[,]" nor is simply sharing "a common residence, although that is an important factor. Cohabitation involves an intimate relationship in which the couple has undertaken duties and privileges that are commonly associated with marriage." Ibid.

In 2014, the Legislature addressed cohabitation in subsection (n) of N.J.S.A. 2A:34-23. That provision sets forth the following considerations, which bear upon cohabitation issues:

> n. Alimony may be suspended or terminated if the payee cohabits with another person. Cohabitation

involves a mutually supportive, intimate personal relationship in which a couple has undertaken duties and privileges that are commonly associated with marriage or civil union but does not necessarily maintain a single common household.

When assessing whether cohabitation is occurring, the court shall consider the following:

(1)  Intertwined finances such as joint bank accounts and other joint holdings or liabilities;

(2)  Sharing or joint responsibility for living expenses;

(3)  Recognition of the relationship in the couple's social and family circle;

(4)  Living together, the frequency of contact, the duration of the relationship, and other indicia of a mutually supportive intimate personal relationship;

(5)  Sharing household chores;

(6)  Whether the recipient of alimony has received an enforceable promise of support from another person within the meaning of subsection h. of [N.J.S.A.] 25:1-5; and

(7)  All other relevant evidence.

In evaluating whether cohabitation is occurring and whether alimony should be suspended or terminated, the court shall also consider the length of the relationship.  A court may not find an absence of cohabitation solely on grounds that the couple does not live together on a full-time basis.

A-0433-20

After carefully reviewing the amendments, "we [saw] no indication the Legislature evinced any intention to alter the Lepis changed circumstances paradigm when it defined cohabitation and enumerated the factors a court is to consider in determining 'whether cohabitation is occurring.'" Landau, 461 N.J. Super. at 116 (quoting N.J.S.A. 2A:34-23(n)). We determined the party seeking modification still bears the burden of establishing "[a] prima facie showing of changed circumstances . . . before a court will order discovery of an ex-spouse's financial status." Id. at 118-19 (alteration in original) (quoting Lepis, 83 N.J. at 157).

We recently held that evidence of all seven factors enumerated in N.J.S.A. 2A:34-23(n) is not required for the moving party "to establish a prima facie [showing] of cohabitation." Temple v. Temple, 468 N.J. Super. 364, 370 (App. Div. 2021). Nor does the statute contain all factors the trial court may consider when reviewing whether cohabitation exists. Ibid. ("[T]he statute does not contain the alpha and omega of what ultimately [may] persuade a court that a[n] [ex-]spouse is cohabiting.").

The moving party satisfies its prima facie burden when the party has presented enough evidence for the "trier of fact [to] conclude the [dependent] spouse and another are in 'a mutually supportive, intimate personal relationship'

18

in which they have 'undertaken duties and privileges that are commonly associated with marriage or civil union.'" Id. at 371 (emphasis added) (quoting N.J.S.A. 2A:34-23(n)).

Thus, an appellate court should not disturb the Family Part judge's determination, unless the appellate court concludes: (1) the trial court failed to consider all the required cohabitation factors listed under N.J.S.A. 2A:34-23(n), see id. at 369 ("To be clear, . . . the Legislature mandates a court's consideration of [all] factors in ultimately determining whether cohabitation is or has been occurring.");[7] (2) the trial court failed to grant defendant the benefit of all reasonable inferences in determining whether the facts support no other conclusion than cohabitation, see id. at 368 (holding the moving party is "entitled to an assumption of the truth of [its'] allegations and the benefit of all reasonable inferences to be drawn from the evidence . . . marshaled"); or (3) the trial court's conclusion "could not reasonably have been reached . . . after considering the [evidence] as a whole." Heinl, 287 N.J. Super. at 345 (citing Rolnick, 262 N.J. Super. at 360).

---

[7] Here, no party has alleged the judge failed to consider all the required factors.

Here, the parties themselves voluntarily entered into the agreement memorialized in the FJOD. Unlike Quinn, the parties' FJOD did not "outline[] the circumstances that will terminate the alimony obligation." Quinn, 225 N.J. at 50 (citing Konzelman, 158 N.J. at 197). Therefore, the judge was not required "to terminate alimony upon cohabitation, even if cohabitation does not result in any changed financial circumstances." Ibid.

In the matter under review, defendant has the burden of establishing a prima facie showing of cohabitation. Landau, 461 N.J. Super. at 118 (citing Lepis, 83 N.J. at 157). To establish a prima facie showing of cohabitation, the moving party is required to produce enough evidence "[s]ufficient to . . . raise a presumption [of cohabitation] unless disproved or rebutted." Prima facie, Black's Law Dictionary 1209 (11th ed. 2019).

The moving party is "entitled to an assumption of the truth of his allegations and the benefit of all reasonable inferences to be drawn from the evidence he had marshaled." Temple, 468 N.J. Super. at 368 (emphasis added). However, conclusory allegations will be disregarded. Lepis, 83 N.J. at 159. The judge may "rely on the supporting documents and affidavits of the parties," ibid., but the judge cannot decide the dispute on the papers "[w]hen presented with competing certifications that create a genuine dispute [of] material fact[]."

A-0433-20

Temple, 468 N.J. Super. at 368-69 (emphasis added); see also Lepis, 83 N.J. at 159 ("[A] party must clearly demonstrate the existence of a genuine issue as to a material fact before a hearing is necessary."); Material fact, Black's Law Dictionary 611 (11th ed. 2019) (defining a material fact as "[a] fact that is significant or essential to the issue or matter at hand").

We recognize that a prima facie showing of cohabitation may be difficult to establish. Landau, 461 N.J. Super. at 118 (citing Konzelman, 158 N.J. at 191-92). "[R]eadily available evidence is often 'consistent with either a dating relationship or a cohabitation relationship.'" Ibid. (quoting Konzelman, 158 N.J. at 191-92). However, the difficulty of the moving party to establish a prima facie showing "cannot justify the invasion of [the ex-spouse]'s privacy." Ibid.; see also Quinn, 225 N.J. at 54-55 ("There are few exercises more intrusive than . . . an inquiry[,] [which] reveals a vast amount of personal information about the daily life of the [dependent] spouse that is of no concern to the [supporting] spouse."). The judge "should be careful not to permit a fishing expedition into a supported spouse's private affairs on a weak claim." Temple, 468 N.J. Super. at 375.

As such, although in weighing the parties' sworn statements the moving party is "entitled to an assumption of the truth of his allegations and the benefit

21

of all reasonable inferences to be drawn from the evidence [it] ha[s] marshaled," id. at 368, discovery is only warranted "[w]hen the facts support no conclusion other than that the relationship has all the hallmarks of a marriage," Quinn, 225 N.J. at 54. A mere romantic relationship between an ex-spouse "and another, characterized by regular meetings, participation in mutually appreciated activities, and some overnight stays in the home of one or the other, [does not] rise[] to the level of cohabitation." Ibid. [T]his level of control over a former spouse would be unwarranted." Ibid.

In Temple, where the trial judge held, without a hearing or factual findings, that the supporting spouse had failed to establish a prima facie showing of cohabitation, we reversed and concluded the supporting spouse had in fact established a prima facie showing of cohabitation and raised a genuine factual dispute regarding the relationship of the dependent spouse and her boyfriend of fourteen years. See generally 468 N.J. Super. 367-77. We noted that the judge had "mistakenly weighed the parties' competing sworn statements and accepted as true [the dependent spouse's] explanation of the facts," while ignoring the abundance of evidence presented by the supporting spouse. Id. at 368. In our decision, we noted the supporting spouse had:

> [S]hown, based on . . . social media[,] . . . the way [the couple] presented in public, as well as information from

family members, that [the couple] are now or have in the past resided together, that they have had a fourteen-year relationship, that they have traveled together extensively, and that there are other "indicia of mutually supportive intimate personal relationship."

. . . [N]ot being privy to the[] [couple's] financial arrangements and circumstances beyond what an outsider may see without unlawfully prying, . . . . [the supporting spouse] decided to hire a private investigator.

This investigation produced considerable evidence of cohabitation or perhaps even a marriage. Specifically, in numerous social media posts over the span of the past seven years, [the boyfriend] referred to [dependent spouse] as "my wife" . . . .

. . . .

. . . [H]e and [dependent spouse] traveled and participated in events extensively. . . .

. . . .

. . . [They][s]pent a considerable amount of time with [each other] at his . . . home . . . .

. . . .

. . . [and] he has resided in [her] . . . apartment.

. . . [Defendant] produced photos obtained by his private investigator that depict [dependent spouse] engaging in household responsibilities, such as bringing groceries into [the boyfriend's] home, performing other household shopping trips, and retrieving and opening mail. [She] is seen in these

23

photographs using a key or entering the . . . residence through the garage keypad access code. . . .

. . . .

In opposing [supporting spouse's] motion, [dependent spouse] filed a certification in which she attempted to refute or explain all the information he presented.

[Id. at 371-75 (citations omitted).]

Although there may have been non-cohabitation explanations, we noted the only question for the judge to consider was whether the supporting spouse "presented enough [evidence] to entitle him to discovery and an evidentiary hearing." Id. at 375.

Here, in contrast to Temple, where the judge had "mistakenly weighed the parties' competing sworn statements and accepted as true [the dependent spouse]'s explanation of the facts," while ignoring the abundance of evidence presented by the supporting spouse, id. at 368, the judge did not abuse her discretion in weighing the credibility of the parties' and third-parties' sworn statements. Firstly, the judge entertained oral argument on the motions. Secondly, the judge did not ignore an abundance of evidence.

In Temple, the supporting spouse had provided: information from family members; numerous social media posts spanning seven years in which the

boyfriend referred to the dependent spouse as "my wife;" traveled and participated in events <u>extensively</u>; spent <u>considerable time</u> with each other at their homes; and produced <u>many photos</u> depicting household responsibilities, such as bringing groceries in, performing other household shopping trips, retrieving and opening mail, and using a key or entering the residence through the garage keycode access pad. <u>Id.</u> at 371-75 (emphasis added).

Contrariwise, here defendant provided no third-party affidavit or certification of friends or family; no social media posts; and he simply relies on the private investigator's limited surveillance of plaintiff and E.S. Moreover, defendant's own investigation showed plaintiff is an employee of E+MSA and has her own officially registered address, separate and apart from E.S. Both parties largely rely on their certifications, for which defendant was entitled to an assumption of the truth and the benefit of all reasonable inferences. <u>Temple</u>, 468 N.J. Super. at 368. However, the reasonableness of defendant's allegations is afforded to the judge, "who deal[s] with these matters." <u>Larbig</u>, 384 N.J. Super. at 21 (quoting <u>Martindell</u>, 21 N.J. at 355).

We disagree with defendant's assertion that he demonstrated prima facie evidence of a change of financial circumstances or cohabitation—plaintiff and E.S. were in "a mutually supportive, intimate personal relationship in which a

couple has undertaken duties and privileges that are commonly associated with marriage[,]" N.J.S.A. 2A:34-23(n)—based solely on the documents filed by both sides. Moreover, the judge found that plaintiff and E.S. spend time together but maintain separate residences. The judge's findings were based upon substantial credible evidence in the motion record and did not warrant further discovery. Therefore, we discern no abuse of discretion and defendant's motion was properly denied without prejudice.

Since defendant failed to establish a prima facie showing of changed circumstances or cohabitation, he is not entitled to discovery or a plenary hearing. Landau, 461 N.J. Super. at 119 (citing Lepis, 83 N.J. at 157). We conclude that the remaining arguments—to the extent we have not addressed them—lack sufficient merit to warrant any further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-0433-20