NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2944-21

IN THE MATTER OF THE
ESTATE OF MICHAEL D.
JONES, Deceased.

_____

> **APPROVED FOR PUBLICATION**
>
> **November 14, 2023**
>
> **APPELLATE DIVISION**

Submitted September 13, 2023 – Decided November 14, 2023

Before Judges Haas, Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey,
Chancery Division, Camden County, Docket No. P-
000005-20.

Lynn M. Castillo, LLC, attorneys for appellant Jeanine
Jones (Kevin Diduch, on the brief).

The Whelihan Law Firm LLC, attorneys for respondent
Shontell A. Jones (Thomas A. Whelihan, on the brief).

The opinion of the Court was delivered by

GOODEN BROWN, J.A.D.

In this probate dispute, defendant Jeanine Jones appeals from an April 23,

2021 order granting partial summary judgment and dismissing her creditor's

claim against the estate of her deceased ex-husband, Michael Jones.  The

creditor's claim arose from a 2017 divorce settlement agreement (DSA) between

Jeanine and Michael.[1]  Jeanine also appeals from an August 3, 2021 order denying her motion for reconsideration.  For the reasons that follow, we reverse and remand.[2]

## I.

We glean these facts from the motion record.  Jeanine and Michael were married in 1990, separated in 2016, and divorced in 2018.  During their eighteen-month period of separation, Jeanine and Michael attempted to reconcile in accordance with certain stipulations.  In her deposition, Jeanine testified that the stipulations included the parties attending couples counseling and Michael making payments to her as recompense for his financial shortcomings as a husband during the marriage.  Although Michael made three payments to Jeanine between June and August 2017, totaling $12,000, the parties never attended counseling and the reconciliation ultimately failed.

---

[1] Due to the common surname, we use first names to avoid confusion and intend no disrespect.

[2] In her amended notice of appeal, Jeanine also lists an April 13, 2022 order denying her request for reimbursement from the estate for expenses allegedly incurred on behalf of the estate and directing her to pay the estate the sum of $27,862.70.  However, because Jeanine makes no supporting legal argument in her merits brief regarding the April 13 order, all issues as to that order are deemed waived.  See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

The couple divorced by entry of a January 17, 2018 final judgment of divorce (JOD), which incorporated a DSA executed on October 19, 2017. According to the DSA, Michael agreed to pay Jeanine the sum of $200,000 according to the following payment schedule:

> (a) Thursday, October 19, 2017, [Michael] will deliver a personal check to [Jeanine in the amount of] $4,500[] upon receipt of th[e] notarized [DSA].
>
> (b) Tuesday, November 20, 2017, [Michael] has agreed to deliver a second check to [Jeanine] in the amount of $45,500[].
>
> (c) The remaining balance of $150,000[] shall be delivered to [Jeanine] over the next three years beginning 2018. Each payment shall be in the amount of $50,000[], payable by the end of each year ending December 2020.

As to equitable distribution, the DSA provided that "[u]pon full execution of th[e DSA], [Michael] shall . . . have sole possession (title) of the [m]arital [r]esidence. However, should [Michael] sell the [m]arital [r]esidence prior to December 31, 2020, he must pay the balance remaining of the $200,000[], in full." If Michael predeceased Jeanine, the DSA stated that "the proceeds from [Michael's] estate will compensate [Jeanine] for the remainder of the $200,000[] in the event there is an unpaid balance." If the couple reconciled after the divorce, Jeanine would not be obligated to "return any settlement agreement monies paid by [Michael]."

A-2944-21

3

Under the DSA, "[a]ny marital asset not listed . . . belong[ed] to the party who ha[d] it . . . in their possession" at the time of the DSA's execution. The DSA also granted each party "exclusive use, possession, and ownership of all items titled in [their respective name] solely including cash on hand, [and] cash in banks." Specifically, as to the couple's respective retirement and bank accounts, the DSA provided that each party would retain "exclusive use, possession, and ownership of any 401k, IRA, or other retirement account listed in [his or her] name" and each party would forever relinquish any right he or she may have to the other's accounts, except that Jeanine's interest was permanently relinquished only if Michael "ha[d] fulfilled his financial obligation[s] by December 31, 2020." The DSA similarly stated that each party would retain "exclusive use, possession, and ownership and shall be the sole owner of any bank account listed in [his or her] name, including, but not limited to, checking accounts, savings accounts, or money market accounts," but Michael's promise was again conditioned on whether he "ha[d] fulfilled his financial obligation by December 31, 2020."

The DSA further specified that "[e]ach party, except as otherwise provided in th[e a]greement, release[d] the other from all claims, liabilities, debts, obligations, actions, and causes of action of every kind, whether known or unknown" (the release provision). Additionally, the DSA provided that by

executing the agreement, Jeanine "w[ould] not waive, release[], [or] relinquish[] any actual or potential right, claim, or cause of action against [Michael], including but not limited to asserting a claim against . . . [Michael's] estate . . . except as otherwise provided in th[e DSA] or arising hereunder" (the waiver provision). Jeanine would waive "any and all rights to inherit part of [Michael's estate] at his death, only if [Michael] ha[d] fulfilled his financial obligation on or by December 31, 2020." Finally, the parties agreed that the DSA "constitute[d] the entire contract of the parties" and "supersede[d] any prior understandings or agreements between them."

Michael made the scheduled payments in accordance with the DSA through December 2018, amounting to $100,000. On November 1, 2019, Michael delivered a check to Jeanine in the amount of $10,000, which, according to the check's memo line, was intended to be the first of two payments for that year. However, on November 9, 2019, Michael was admitted to the hospital and underwent emergency surgery to treat a perforated gastric ulcer. The surgery was unsuccessful, and on November 14, 2019, Michael was placed into palliative care.

On the same day, November 14, 2019, Michael executed a Banking Power of Attorney (the POA) appointing Jeanine as attorney-in-fact, which Jeanine used to withdraw $17,000 from Michael's PNC bank account later that day.

Among other things, the POA authorized Jeanine "to draw, sign and deliver checks or drafts; to withdraw by check, order, draft, wire transfer or otherwise any funds or property . . . deposited with or left in the custody of PNC Bank," and "to do everything necessary in exercising these powers." In her deposition testimony, Jeanine acknowledged that there were no witnesses to Michael's signature on the POA other than Jeanine, and a notary at PNC bank apparently notarized Jeanine's signature, but not Michael's.

Michael died intestate two days later on November 16, 2019, at fifty-nine years of age, having paid only $110,000 of the $200,000 sum owed under the DSA. According to her deposition testimony, after Michael's death, Jeanine took it upon herself to organize Michael's funeral, pay his outstanding bills, and maintain the marital home "to [give] the appearance that someone was there and that it was secure" while it remained vacant. To that end, Jeanine paid approximately $1,000 to cover the costs of the church service and funeral programs.[3] She also paid the home's gas, electric, and internet bills until June 2020, all of which were "still in her name." In addition, she paid for lawn service, security system installation and maintenance, homeowners' insurance,

---

[3] In her original creditor's claim, Jeanine listed an additional $7,472 payment to the funeral home. However, in her deposition, Jeanine admitted that the funeral home expenses should not have been included in the claim, as she had mistakenly used Michael's PNC debit card to pay that bill.

garbage pickup, storage of Michael's vehicles, and the home's property taxes, all of which totaled $8,820.85. Lastly, Jeanine paid $2,532.86 to cover Michael's medical expenses.

At her deposition, Jeanine testified that she had withdrawn the $17,000 from Michael's PNC bank account to "take care of [Michael's] household [expenses]," but the expenses were ultimately "paid with checks" or "electronic payments" that were drawn directly from her own checking account. Jeanine acknowledged that during that time, she went to Michael's house periodically, but she denied moving into the house or removing any items from the home. Nonetheless, Jeanine admitted redeeming a number of U.S. Series EE Bonds that designated her as the pay-on-death (POD) beneficiary, and acknowledged that the bonds were stored in the office of Michael's home. Jeanine received $77,864.40 from redeeming the bonds.

On February 14, 2020, plaintiff Shontell Jones, Michael's daughter from a previous relationship, filed an amended complaint and order to show cause seeking, among other things, appointment as the administrator of Michael's estate; a full accounting from Jeanine of all financial transactions involving Michael's accounts at the time of his death; a full accounting of all items Jeanine removed from Michael's home; and an order directing Jeanine to vacate Michael's house, pay the estate rent from the date she took possession, and

reimburse the estate for all utility costs attributable to her occupancy. Jeanine filed a pleading designated as an "[a]nswer, [s]eparate [d]efenses, and [c]ounterclaim," seeking her DSA entitlements.[4]

In a June 12, 2020 order, plaintiff was appointed administrator of Michael's estate. The June 12 order also granted plaintiff's request for a full accounting from Jeanine, and directed Jeanine to vacate Michael's home and pay the estate rent and utility costs for her occupancy.[5] Pursuant to the June 12 order, the matter was "converted to a plenary proceeding" and a hearing was scheduled to address Jeanine's entitlements under the DSA.

On August 10, 2020, Jeanine filed a creditor's claim against the estate, wherein she claimed that the estate owed her: $100,000 pursuant to the DSA; $19,833.20 as reimbursement for "medical bills, funeral costs and household bills and real estate taxes paid by [her] from [her] personal funds" on the estate's behalf; and "[a]ny portion" of Michael's Department of Health and Human Services Office of Inspector General pension benefits "as determined by [the United States Office of Personnel Management]." In support of her claims, Jeanine submitted an Excel spreadsheet that she claimed was "the most recent

---

[4] None of the pleadings were provided in the record.

[5] Notwithstanding her deposition testimony, Jeanine's attorney apparently conceded at a hearing that Jeanine had been residing at Michael's home. The hearing transcript was not provided in the record.

accounting" of Michael's "outstanding obligations to [her]" under the DSA, a "summary of expenses" Jeanine claimed to have made on behalf of the estate, and documents supporting her claim to the pension.

On October 22, 2020, the estate filed a notice of rejection of claim pursuant to N.J.S.A. 3B:22-7, denying that Jeanine was a creditor of the estate. The estate disputed Jeanine's accounting of payments allegedly made on behalf of the estate, claimed Jeanine actually owed the estate money, and asserted that the DSA had already been satisfied because Jeanine had received $216,864.40 from Michael as follows:

> (1) $17,000 withdrawal from Michael's PNC bank account prior to his death;
>
> (2) $122,000 in settlement payments from Michael, including the payments Michael made during the reconciliation period; and
>
> (3) $77,864.40 from redeeming Michael's U.S. Series EE Bonds that belonged to Michael but designated Jeanine as the POD beneficiary.

After the close of discovery, the estate moved for partial summary judgment on Jeanine's DSA-related claims, asserting that the claims were satisfied by Jeanine's receipt of $216,864.40, including the redemption of the savings bonds. Jeanine opposed the motion, arguing that the bonds were separate and apart from the DSA and should not be credited against her DSA entitlement. According to Jeanine, because the estate had supplied no evidence

of Michael's intentions to contradict Jeanine's attestation that the parties intended the POD designation to survive the divorce, as well as the fact that the DSA was silent on the bonds' disposition, summary judgment was inappropriate.

During oral argument conducted on April 23, 2021, the judge observed that "the big question" involved the bonds and posited that Jeanine "want[ed] her $200,000 plus the $77,864." However, in an oral decision, the judge determined that the "amounts already received by [Jeanine] satisf[ied the DSA,]" thereby concluding that the bonds "count[ed]" towards the $200,000 DSA obligation. In that regard, the judge accepted the estate's argument that upon the party's divorce, the bonds' POD designation was presumptively revoked pursuant to N.J.S.A. 3B:3-14. The judge instructed the estate's counsel to draft an order that "state[d] the six checks to the tune of $122,000, plus the $77,000 . . . in bonds," in addition to the $17,000 that Jeanine had withdrawn from Michael's PNC account "[s]atisfie[d] the $200,000 that was owed under the [DSA]." The judge also directed counsel to indicate that those sums "result[ed] in an overpayment to [Jeanine]" in the amount of $16,864.40, "[w]hich still remain[ed] an open issue."

When Jeanine's counsel continued to disagree with the judge's ruling, the judge reiterated:

> [T]he cashing in of the bonds by [Jeanine] counts towards the money she was owed, the $200,000. . . .

[Jeanine] got her money, she got extra money. So I don't know yet what to do with the extra part. But if what you're saying is that with the inclusion of the $77,000 she's still owed another $100,000[,] well that's a different story, I'm not aware of that, I'd have to go back and look at the divorce decree and say okay, was she supposed to get another $100,000 that she didn't receive[] . . . . So that's what I'm allowing you to still flush out . . . . But if with the inclusion of the $77,000 in bonds she got her $200,000 plus, that may or may not cover what you believe is still owed under the additional $100,000. I don't know.

. . . .

Now that's the argument I'm allowing you to preserve if it's somewhere in the divorce decree that I'm not aware of.

After the hearing, the estate's counsel submitted a proposed order as instructed, which order was signed by the judge on April 23, 2021, over Jeanine's attorney's objection. The order granted the estate partial summary judgment, dismissed with prejudice Jeanine's creditor's claim that the estate was liable to Jeanine for additional payments under the DSA, and determined that Michael's financial obligations under the DSA were "satisfied in full" by: (1) Michael's payment of $122,000 from June 2017 to November 2019 "in contemplation of and in accordance with the DSA;" (2) Jeanine's withdrawal of $17,000 from Michael's PNC bank account "for her personal use;" and (3) Jeanine's redemption of $77,864.40 in US savings bonds "owned by [Michael]." The

order reserved judgment on the estate's claim for reimbursement of $16,864.40 from Jeanine.

Jeanine subsequently moved for reconsideration. During oral argument conducted on August 3, 2021, among other things, Jeanine argued that the judge "overlooked the plain language . . . in the agreement and incorrectly relied upon the federally preempted estate statutes to determine the distribution of the federal bond proceeds." Jeanine asserted "[t]he bonds were not specifically included in the [DSA,]" which "preserve[d Jeanine's] rights to items that [were] expressly outside of the agreement," and "federal regulations would govern distribution of th[e] bonds."

The judge rejected Jeanine's argument, explaining:

> [D]oes the fact that she received, under the bond[s], her $77,000 . . . plus, take care of the rest of what was owed to her? . . . [M]y decision was that . . . that was part of the package . . . because once they were divorced what would have been [Michael's] rational[e] to leave her as beneficiary of those bonds? . . . [T]hat was the basis of my decision because there wasn't anything to counter that. There wasn't anything to tell me that his intention under the divorce settlement agreement was that . . . [Jeanine was] going to stay beneficiary . . . .
>
> The agreement itself is fairly comprehensive. It says she gets $200,000. . . . [T]hat's part and parcel of what she got with the bonds and the [$122,000] she got before . . . . [I]t's not that I was so off base . . . that it was palpably incorrect for me to make that ruling.

The judge concluded Jeanine failed to meet the standard for reconsideration by failing to identify "a palpable error" or "mistake," denied the motion, and entered a memorializing order the same day. A final order requiring Jeanine to pay the estate $27,862.70, and denying Jeanine's request for reimbursement of expenses allegedly incurred on behalf of the estate was subsequently entered on April 13, 2022. This appeal followed.

On appeal, Jeanine argues the judge erred in granting partial summary judgment and denying reconsideration. Specifically, Jeanine asserts the judge misapplied federal law and misinterpreted the DSA, which led the judge to mistakenly credit the bond proceeds towards the amount owed to her under the DSA. According to Jeanine, under federal law, the savings bonds were not part of Michael's estate, and federal law preempted any state law to the contrary. Further, Jeanine contends the judge's decisions were based on erroneous assumptions about the DSA that were inconsistent with the agreement's plain language.

## II.

"[W]e review the trial court's grant of summary judgment de novo under the same standard as the trial court." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 366 (2016) (citations omitted) (quoting R. 4:46-2(c)).]

Whether a genuine issue of material fact exists depends on "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523 (1995). "If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). "We review issues of law de novo and accord no deference to the trial judge's [legal] conclusions . . . ." MTK Food Servs., Inc. v. Sirius Am. Ins. Co., 455 N.J. Super. 307, 312 (App. Div. 2018).

On the other hand, we review a trial court's decision on a motion for reconsideration under an abuse of discretion standard. Pitney Bowes Bank, Inc.

v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015).  "An abuse of discretion 'arises when a decision is ["]made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.["]'"  Kornbleuth v. Westover, 241 N.J. 289, 302 (2020) (quoting Pitney Bowes Bank, 440 N.J. Super. at 382).

"Where the order sought to be reconsidered is interlocutory, as in this case, Rule 4:42-2 governs the motion."  JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 160 (App. Div. 2022).  "Reconsideration under this rule offers a 'far more liberal approach' than Rule 4:49-2, governing reconsideration of a final order."  Ibid. (quoting Lawson v. Dewar, 468 N.J. Super. 128, 134 (App. Div. 2021)).  Under Rule 4:42-2, interlocutory orders are "subject to revision at any time before the entry of final judgment in the sound discretion of the court in the interest of justice."  Lawson, 468 N.J. Super. at 134 (quoting R. 4:42-2(b)); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:42-2 (2023) ("[A]n order adjudicating less than all the claims is subject to revision in the interests of justice at any time before entry of final judgment.").  In contrast, Rule 4:49-2 "requires a showing that the challenged order was the result of a 'palpably incorrect or irrational' analysis or of the judge's failure to 'consider' or 'appreciate' competent and probative evidence."  Lawson, 468 N.J.

Super. at 134 (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996)).

Turning to the substantive principles governing this appeal, "[a]n agreement that resolves a matrimonial dispute is no less a contract than an agreement to resolve a business dispute," and, as such, "is governed by basic contract principles." Quinn v. Quinn, 225 N.J. 34, 45 (2016). "The interpretation or construction of a contract is generally a legal question . . . ." Petersen v. Twp. of Raritan, 418 N.J. Super. 125, 133 (App. Div. 2011). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." JPC Merger, 474 N.J. Super. at 160 (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

> "It is well-settled that '[c]ourts enforce contracts "based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract."'" [In re Cnty. of Atlantic], 230 N.J. 237, 254 (2017) (alteration in original) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)). Contract terms are generally "given their plain and ordinary meaning." M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002). Because "[t]he plain language of the contract is the cornerstone of the interpretive inquiry[,] 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" [Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020)] (quoting [Quinn, 225 N.J. at 45]). "If we conclude that a contractual term is ambiguous, we 'consider the parties' practical construction of the contract as

evidence of their intention and as controlling weight in determining a contract's interpretation.'" Ibid. (quoting [Cnty. of Atlantic], 230 N.J. at 255).

[JPC Merger, 474 N.J. Super. at 160-61.]

"In a word, the judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the express general purpose." Barila, 241 N.J. at 616 (quoting Owens v. Press Publ'g Co., 20 N.J. 537, 543 (1956)).

Applying these principles, we reverse because we disagree with the judge's legal determinations regarding the interpretation of the DSA as well as the application of state law to the disposition of federal savings bonds in the circumstance of this case. As to the latter, we agree with Jeanine's contention that the judge erred in applying state law to decide the bonds' disposition because state law was preempted by controlling federal law.

"A savings bond is a contract between the United States and the bond owner, and Treasury regulations are incorporated into the bond contract." Laturner v. United States, 933 F.3d 1354, 1357 (Fed. Cir. 2019). In Free v. Bland, the United States Supreme Court held that "Treasury Regulations creating a right of survivorship in United States Savings Bonds pre-empt[ed] any inconsistent Texas community property law by virtue of the Supremacy

Clause, Article VI, Clause 2, of the Constitution." 369 U.S. 663, 664 (1962);

see Treasurer of N.J. v. U.S. Dep't of Treasury, 684 F.3d 382, 406 (3d Cir. 2012)

("[W]here Congress has delegated the authority to regulate a particular field to

an administrative agency, the agency's regulations issued pursuant to that

authority have no less preemptive effect than federal statutes." (quoting Fellner

v. Tri-Union Seafoods, LLC, 539 F.3d 237, 243 (3d Cir. 2008))).

> In [Free], Treasury regulations provided that when one bond owner died, the surviving co-owner (there, the decedent's husband) became the sole owner of the bond. [369 U.S.] at 664-65. Under Texas state community property laws, however, the principal beneficiary under the decedent's will (there, the decedent's son) was entitled to a one-half interest in the bonds—despite not being a co-owner of the bond under Treasury regulations. [Ibid.] The Court held that the state law was preempted because it prevented bond owners "from taking advantage of the survivorship provisions" of the Treasury regulations. Id. at 669-70. The Court reasoned that "Federal law of course governs the interpretation of the nature of the rights and obligations created by the Government bonds," [Ibid.] (quoting Bank of Am. Tr. & Sav. Ass'n v. Parnell, 352 U.S. 29, 34 (1956)), and a state may not "fail[] to give effect to a term or condition under which a federal bond is issued," id. at 669. In other words, Treasury regulations conferred a right on bond holders which Texas state law impermissibly restricted.
>
> [Laturner, 933 F.3d at 1361 (emphasis omitted).]

After concluding that the federal regulations preempted state law, the

Court nevertheless noted that, unlike other regulatory survivorship provisions,

A-2944-21

the regulations governing savings bonds "neither insulate[d] the purchasers from all claims regarding ownership nor immunize[d] the bonds from execution in satisfaction of a judgment." Free, 369 U.S. at 670. The Court interpreted this omission as "an exception implicit in the savings bond regulations, including the survivorship provision, so that federal bonds will not be a sanctuary for a wrongdoer's gains." Ibid. (internal quotation marks omitted). Given that exception, the Court clarified that its ruling was premised on the fact that "no issue of fraud was or could properly have been decided by the court below" based on the record presented. Id. at 671.

In Yiatchos v. Yiatchos, the United States Supreme Court extended the preemption holding in Free to bonds held in the beneficiary form. 376 U.S. 306, 307-08 (1964). In Yiatchos, the decedent, a resident of a community property state, used "community funds belonging to himself and his wife" to purchase federal savings bonds. Id. at 308. The bonds were issued in the name of the decedent as the registered owner but "were made payable on his death to his brother." Ibid. The decedent's will then "nam[ed] his wife as executrix and bequeath[ed] all cash and bonds owned by him at the time of his death to his brother, four sisters and a nephew." Ibid.

The brother sued

> to establish his ownership of the bonds, relying upon
> the federal regulations providing for registration of the

A-2944-21

19

savings bonds in the beneficiary form and providing that in the case of the death of the registered owner "the beneficiary will be recognized as the sole and absolute owner, and payment or reissue will be made as though the bond were registered in his name alone."

[Ibid. (quoting 31 C.F.R. § 315.66).]

Applying the state's community property law, the trial court ordered that the bonds "be divided into two equal parts, one-half to go to the wife and the other half to be distributed in accordance with the will." Ibid. The Supreme Court of Washington affirmed, reasoning that by using community funds to purchase bonds that were exclusively payable to himself or his brother, the decedent had effectively "divest[ed] the wife of any interest in her own property," which was a "constructive fraud" under state law. Ibid.

The United States Supreme Court reversed, reasoning that "survivorship provisions of the federal regulations must control, preempting, if necessary, inconsistent state law which interferes with the legitimate exercise of the Federal Government's power to borrow money." Id. at 311. The Court concluded that "[u]nder the federal regulations, [the brother was] entitled to the bonds unless [the decedent] committed fraud or breach of trust tantamount to fraud" in designating him as beneficiary. Id. at 309. "[T]he case was remanded to give the widow an opportunity to demonstrate that she had not consented to or ratified the purchase and registration of the bonds" and "for the determination, under

A-2944-21

state law, whether the widow had an interest in the community's specific assets, or only a half interest in the estate generally." Ridgway v. Ridgway, 454 U.S. 46, 58 (1981) (citing Yiatchos, 376 U.S. at 309).

Because federal regulations govern "the interpretation of the nature of the rights and obligations created by the Government bonds," Free, 369 U.S. at 669-70 (quoting Bank of Am., 352 U.S. at 34), and preempts state law where state law "fails to give effect to a term or condition under which a federal bond is issued," id. at 669, the question presented is whether application of N.J.S.A. 3B:3-14 in this case conflicts with federal regulations governing bond ownership. If so, absent evidence of fraud, breach of trust, or other wrongful conversion of property, Ridgway, 454 U.S. at 58-59, "the federal law takes precedence and the state law is preempted," Laturner, 933 F.3d at 1361 (quoting Murphy v. NCAA, 138 S. Ct. 1461, 1480 (2018)).

The bonds at issue in this case are Series EE bonds. The Treasury is specifically authorized by Congress to "prescribe for savings bonds . . . the conditions, including restrictions on transfer, to which they will be subject," as well as "conditions governing their redemption." 31 U.S.C. §§ 3105(c)(3)-(4). Treasury regulations governing the "terms and conditions" of Series EE savings

bonds are set forth in Part 353 of Title 31 of the Code of Federal Regulations.[6] U.S. Dep't of the Treasury, Savings Bond Regulations, TreasuryDirect, https://www.treasurydirect.gov/laws-and-regulations/savings-bond-regulations (last visited July 18, 2023); see also 31 C.F.R. § 353.0 (amended 2005).

Pursuant to the regulations, a bond's "registration must express the actual ownership of, and interest in, the bond," and "registration is conclusive of ownership, except as provided in [§] 353.49."[7] 31 C.F.R. § 353.5(a); see id. § 353.7(a)(3) ("A bond may be registered in the name of one individual payable on death to another."). Furthermore, savings bonds are "not transferable and are payable only to the owners . . . except as specifically provided in [Part 353] and then only in the manner and to the extent so provided." Id. § 353.15. In order to effectuate any change in a bond's registration, including changes in ownership pursuant to recognized court orders, a Series EE bond must be reissued. U.S. Dep't of the Treasury, Changing information about EE or I savings bonds (reissuing), TreasuryDirect, https://treasurydirect.gov/savings-bonds/manage-

---

[6] Jeanine incorrectly relies on 31 C.F.R. § 360.22, which applies to Series I bonds, while the estate mistakenly cites 31 C.F.R. § 315, which applies to Series A, B, C, D, E, F, G, H, J, and K bonds, as well as U.S. Savings Notes. Notwithstanding the error, the regulations relied on by the parties are identical to the provisions specific to Series EE bonds.

[7] 31 C.F.R. § 353.49 provides: "A bond may be reissued to correct an error in registration upon appropriate request supported by satisfactory proof of the error."

bonds/changing-information-ee-or-i-bonds (last visited July 18, 2023); 31 C.F.R. § 353.47 (amended 2014). "Reissue of a bond may be made only under the conditions specified in [Part 353]." 31 C.F.R. § 353.45(a).

Generally speaking, "[t]he Department of the Treasury will not recognize a judicial determination that gives effect to an attempted voluntary transfer inter vivos of a bond, or a judicial determination that impairs the rights of survivorship conferred by these regulations upon a co[-]owner or beneficiary." Id. § 353.20(a). That said, the Treasury will recognize "a claim against an owner of a savings bond and conflicting claims of ownership of, or interest in, a bond between . . . the registered owner and the beneficiary" if the claim is "established by valid, judicial proceedings specifically listed in [31 C.F.R. §§ 353.20-353.24]." Id. § 353.20(b). "To establish the validity of judicial proceedings, certified copies of the final judgment, decree, or court order, and of any necessary supplementary proceedings, must be submitted" with the request for reissue or payment. Id. § 353.23(a).

Divorce proceedings are among those recognized by the Treasury. Id. § 353.22. In the event of a divorce, "[t]he Department of the Treasury will recognize a divorce decree that ratifies or confirms a property settlement agreement disposing of bonds or that otherwise settles the interests of the parties in a bond." Id. § 353.22(a). Pertinent to this appeal, to eliminate a beneficiary

designation on a bond, federal regulations require the owner to surrender the bond to an authorized agent and submit a request for reissue using specified "[s]ervice forms." Id. §§ 353.51, 353.47(c)(3). The submission of certified documents to establish the divorce decree's validity is also required. Id. §§ 353.22, 353.23. Upon satisfaction of § 353.23(a), "[r]eissue of a savings bond may be made to eliminate . . . or to substitute the name of one spouse for that of the other spouse as owner, co[-]owner, or beneficiary pursuant to the decree." Id. § 353.22(a).

N.J.S.A. 3B:3-14 provides, in pertinent part:

> Except as provided by the express terms of a governing instrument, a court order, or a contract relating to the division of the marital estate made between the divorced individuals before or after the marriage, divorce or annulment, a divorce or annulment:
>
> (1) revokes any revocable:
>
>> (a) dispositions or appointment of property made by a divorced individual to his former spouse in a governing instrument . . . ;
>
> [N.J.S.A. 3B:3-14(a).]

Thus, under state law, "divorce automatically revokes a disposition of property made by a divorced individual to his [or her] former spouse in a governing instrument." Fox v. Lincoln Fin. Grp., 439 N.J. Super. 380, 389 (App. Div. 2015) (citing N.J.S.A. 3B:3-14). The term "[g]overning instrument" includes a

"security registered in beneficiary form with the designation 'pay on death,'" N.J.S.A. 3B:1-1, and for purposes of the revocation rule, "means a governing instrument executed by the divorced individual before the divorce or annulment," N.J.S.A. 3B:3-14(b)(2).

Against this legal backdrop, Jeanine contends "the 'presumptive revocation' provision of N.J.S.A. 3B:3-14 did not apply to the distribution of [Michael's] bonds" because federal regulations "address[] the issue of changing the designation of a [POD] beneficiary in the event of a divorce" and "provide[] specific steps which must be taken to revoke the designation of a [POD] beneficiary, none of which were taken by [Michael] prior to his death." The estate counters that "[f]ederal law does not conflict with New Jersey law in this instance" because "federal regulations regarding savings bonds contemplate that divorced bond owners will be permitted to remove an ex-spouse as [a POD] beneficiary." According to the estate, because Michael "could have changed the [POD] designation on the savings bonds and that change would have been recognized by the Department of the Treasury," applying N.J.S.A. 3B:3-14 to attain the same result is not contrary to federal law notwithstanding Michael's inaction.

We are convinced that under Free and Yiatchos, the regulations governing bond registration and ownership as well as the modification requirements

pursuant to recognized judicial proceedings conflict with the inconsistent provisions of N.J.S.A. 3B:3-14, which would automatically revoke the bonds' POD designation and disposition upon divorce. As a result, the federal regulations preempt N.J.S.A. 3B:3-14 under the circumstances of this case. A contrary result would fail "to give effect to a term or condition under which a federal bond is issued." Free, 369 U.S. at 669. Under 31 C.F.R. § 353.70(c)(1), a beneficiary's bond ownership is established upon proof of death of the owner. Therefore, once Michael died, in the absence of fraud or breach of trust, neither of which is alleged here,[8] Jeanine became the sole and absolute owner of the bonds. See ibid. By determining that Jeanine's beneficiary designation was automatically revoked under N.J.S.A. 3B:3-14 by virtue of the divorce, the judge "fail[ed] to give effect" to Jeanine's federal ownership rights and "rendered the award of title meaningless." Free, 369 U.S. at 669.

We reject the estate's contention that Free is not controlling because Free "did not involve a divorce decree or a divorce settlement agreement." Federal courts have consistently applied Free beyond the facts presented in that case.

---

[8] In its brief, the estate implies wrongdoing on Jeanine's part. However, the record is inadequate to sustain such a finding on summary judgment. See Sullivan v. Port Auth. of N.Y. & N.J., 449 N.J. Super. 276, 283 (App. Div. 2017) (noting that "[c]onclusory and self-serving assertions by one of the parties are insufficient" on summary judgment (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005))).

See United States v. Chandler, 410 U.S. 257, 261-62 (1973) (applying Free in upholding assessment of estate tax after decedent attempted inter vivos transfer of bonds without removing her own name as co-owner); Laturner, 933 F.3d at 1360-61 (applying Free to reject states' claim of bond ownership based on state escheat laws); cf. Hisquierdo v. Hisquierdo, 439 U.S. 572, 582-83 (1979) (discussing Free and Yiatchos in determining the effect of divorce on allocation of federally-created retirement benefits).

We also reject the estate's reliance on out-of-state cases that neither have precedential value nor compel a different result. See Meadowlands Basketball Assocs. v. Dir., Div. of Tax'n, 340 N.J. Super. 76, 83 (App. Div. 2001) (noting that other states' "interpretive decisions are . . . not binding or controlling"). The estate principally relies on Smalley v. Smalley, 399 S.W.3d 631 (Tex. App. 2013), where, as here, the husband "did not have the Savings Bonds reissued and did not change the [POD] beneficiary designation . . . following the couple's divorce." Id. at 634. After the husband died intestate, the ex-wife "obtained possession of the Savings Bonds" and the estate filed a petition seeking to enforce the terms of the final divorce decree that "divested [the ex-wife] of all right, title, interest, and claim in and to . . . all dividends, splits, and other rights and privileges in connection [with] . . . [t]he U.S. Treasury Savings Bonds . . . in the name of either or both parties." Id. at 634-35. The Smalley court declined

to apply Free's preemption holding because the divorce decree satisfied the relevant federal regulations and did "not conflict with enforcement of the alleged waiver" of her beneficiary rights. Id. at 640. Here, the DSA contained no provision identifying the savings bonds or divesting Jeanine's rights in them. Indeed, the DSA never even mentions the savings bonds.

The estate's reliance on Meer v. Garvey, 212 So.2d 97, 98 (Fla. Dist. Ct. App. 1968) is similarly misplaced. In Meer, during the marriage, the husband purchased federal savings bonds, designating his wife as co-owner on some and beneficiary on others. Id. at 97. After they divorced, the husband retained possession of the bonds and, after his death, his estate filed suit to determine ownership of the bonds because his "will left his entire estate to his two brothers." Id. at 97-98. Like the DSA in this case, the settlement agreement between the spouses in Meer did not specifically dispose of the disputed federal savings bonds. Id. at 98. However, the release provision in Meer "released, discharged, barred, terminated and extinguished" any "manner of . . . bonds, covenants, contracts, agreements, judgments, claims and demands whatsoever, in law or in equity, which each party ever had." Ibid. Moreover, unlike the DSA, the property settlement agreement in Meer did not appear to include an express reservation of certain rights. Id. at 98-99.

The majority in <u>Meer</u> distinguished <u>Free</u> and found "[n]o . . . conflict" warranting preemption. <u>Id.</u> at 99. The court determined that the ownership of the bonds was vested in the estate, rather than the ex-wife, because the settlement agreement "was broad enough in scope to include and settle their respective interests in the U.S. Savings Bonds." <u>Id.</u> at 98-99. However, the dissenting opinion would have awarded the bonds to the ex-wife based on "[the] view . . . [that] the agreement [was not] broad enough to nullify [the ex-wife's] ownership of the bonds." <u>Id.</u> at 100 (Pearson, J., dissenting).

Once again, here, the DSA contained no provision identifying the bonds or divesting Jeanine's rights in them. The judge's decision to credit the bond proceeds against Jeanine's DSA claims was premised on an unsubstantiated assumption that Michael intended to remove Jeanine as a beneficiary after they divorced as well as the mistaken belief that "all issues ha[d] been resolved" by the DSA. However, that belief is contrary to the plain terms of the DSA, which provided that Jeanine

> will not waive, release[], and relinquish[] any actual or potential right, claim, or cause of action against the other party, including but not limited to asserting a claim against the estate of the other party or to act as a personal representative of that estate, except as otherwise provided in this agreement or arising hereunder.

To bolster the judge's mistaken belief, the estate invokes the release provision, arguing that "[Jeanine] relinquished all claims except those based on enforcement of [Michael's] obligations under the terms of the DSA." The DSA's release provision states:

> Each party, except as otherwise provided in this [a]greement, releases the other from all claims, liabilities, debts, obligations, actions, and causes of action of every kind, whether known or unknown. However, neither party is relieved from any obligation under this agreement, or under any document executed pursuant to this agreement, or under any judgment or order issued incident to this agreement.

The release provision expressly applied to a right that had not been preserved elsewhere in the DSA. The waiver provision preserved "any actual or potential right, claim, or cause of action" Jeanine had, not just those associated with enforcement of Michael's DSA obligations. Read together, Jeanine did not waive all claims or rights she had relating to Michael. Therefore, contrary to the estate's assertion, the release provision did not conclusively divest Jeanine of all rights unrelated to enforcing her entitlement to the $200,000. Instead, given that the waiver provision preserves "any and all rights," the DSA preserved the right of survivorship the bonds conferred upon Jeanine. See Manahawkin Convalescent, 217 N.J. at 118 ("Contracts should be read 'as a whole in a fair and common sense manner.'" (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009))).

In sum, the judge erred as a matter of law in concluding that the bonds should be credited towards the estate's DSA obligation. Under the applicable federal regulations, Jeanine became the sole owner of the bonds upon Michael's death, and she was entitled to payment as the sole owner. See 31 C.F.R. § 353.70(c)(1). In the absence of any allegation of fraud or breach of trust, application of N.J.S.A. 3B:3-14 in this case, which allowed the estate to improperly avoid the consequences of the bonds' beneficiary registration, conflicts with the governing federal regulations under Free and Yiatchos and is therefore preempted. Nothing in the parties' DSA warrants a contrary conclusion.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2944-21