**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2565-24

AMERICAN LENDING
CENTER, LLC,

     Plaintiff-Respondent,

v.

CROWN BANK,

     Defendant-Appellant.

_____

Submitted February 25, 2026 – Decided June 29, 2026

Before Judges Currier and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-1443-21.

Hill Wallack LLP, attorneys for appellant (Eric I. Abraham, of counsel and on the briefs; Hana Jeong Pak, on the briefs).

Lucosky Brookman LLP, attorneys for respondent (Donald E. Taylor, of counsel and on the brief; Danielle A. Schweizer, on the brief).

PER CURIAM

In this matter we consider the priority of lien interests held by several lenders following the sale of the real property collateral. Following a bench trial, the court entered a declaratory judgment as to the parties' respective priorities, concluding the parties had a shared interest and assigning certain percentages to the apportionment of the first loan. Defendant Crown Bank (Crown) appeals from the order, contending both of its liens had first priority. After a review of the record in light of the applicable principles of law, we conclude Crown Bank had first priority under the plain language of the pertinent documents and reverse.

I.

The Construction Loans

In 2013, Crown, a small privately held community bank, originated a construction loan, secured by two separate mortgages, to Hotel Investors, LLC and Monroe Hospitality, LLC (collectively, Borrower) in the global amount of $9,633,149 for the construction of a 107-room hotel located in South Brunswick and Monroe Township (the project).

Crown and Borrower documented the loan in two pieces, but construed it as one global loan for the project. The first loan was a long-term construction

2

loan in the amount of $6,020,718, with a term comprised of a construction period plus ten years. The loan was secured by a first priority lien mortgage.

The second loan was a "Bridge Loan" in the amount of $3,612,431 and it represented the portion of the loan subject to the Small Business Administration § 504 program redemption. Both loans were secured by Construction Mortgages and Security Agreements between Crown and Borrower.

Plaintiff American Lending Center, LLC (ALC) is a financial service provider and EB-5 Immigrant Investor Program (EB-5) brokerage company. ALC raises funds from foreign nationals seeking lawful permanent residency in the United States and then uses those funds to provide loans to qualified businesses. ALC forms limited partnerships in which ALC is the general partner and the foreign investors are the limited partners. The foreign investors provide all the necessary capital contribution into the limited partnership for EB-5 investment purposes; ALC makes no capital contribution into the limited partnership. ALC facilitates these transactions on behalf of its EB-5 client base, but the limited partnership undertakes the financial risk of losing its investment. The funds received by ALC are listed on its balance sheet as its own property.

3

Upon completion of a project that meets EB-5 qualifications set forth by the U.S. Citizen and Immigration Services (USCIS), investors recoup their investment and qualify for EB-5 immigrant visas.

The Participation Agreement

In 2016, Crown and ALC executed a Participation Agreement to memorialize ALC's investment of $2,500,000 on behalf of 15277 L.P., a limited partnership comprised of five Chinese foreign investors who contributed the funds.

Under the Participation Agreement, ALC's rights were subordinate to Crown. Section 6.1 provided that

> ALC hereby subordinates and makes junior the indebtedness represented by the ALC Participation Interest and ALC's interest in the Loan Documents and all rights, remedies, terms and covenants contained therein to the indebtedness represented by the Crown Loan Interest and Crown's interest in the Loan Documents and all rights, remedies, terms and covenants contained therein. Except as otherwise expressly provided in this section, ALC's rights to repayment of the indebtedness represented by the ALC Participation Interest is hereby subordinated and secondary to Crown's rights to repayment of the indebtedness represented by the Crown Loan Interest in all respects including but not limited to repayment obtained through the exercise of Crown's rights and remedies pursuant to the Loan Documents after an Event of Default, which amounts shall not be distributed pro rata, but shall be used first to repay the

4

indetbtedness represented by the Crown Loan Interest in full.

[(Emphasis added).]

Under Section 6.2,

[i]f an Event of Default shall have occurred and be continuing, all amounts tendered by the Borrower or otherwise available for payment to Crown and ALC on the Loan, . . . shall be applied to the Crown Loan Interest and then to the ALC Participation Interest in the following order of priority:

(a) first, to Crown in an amount equal to all outstanding principal, interest, fees and any other amounts due on the Crown Loan Interest; and

(b) second, to ALC in an amount equal to all outstanding principal, interest fees and any other amounts due on the ALC Participation Interest.

Several modification agreements were executed to extend the maturity dates of the first and second loans, in an attempt to enable the Borrower to complete the construction.

The Borrower's Default

In 2018, the Borrower failed to make timely loan payments and defaulted under various provisions of the loan documents. Crown commenced a foreclosure proceeding against the property and notified ALC of the default and foreclosure action.

5

The foreclosure litigation revealed Borrower had other mortgages and liens on the property totaling roughly $4.7 million. Thus, Crown wanted to complete foreclosure and take back the property free of all liens.

In June 2019, ALC advised Crown that USCIS had issued an initial denial of the project's eligibility under EB-5. The parties then agreed to assist the Borrower to locate a third-party investor to fund the remaining construction costs. This resulted in Crown executing a Forbearance Agreement with the Borrower.

The First Amendment

In July 2019, the parties entered into a First Amendment to the Participation Agreement (First Amendment), the interpretation of which is the subject of controversy in this litigation. ALC, on behalf of 15277 L.P., and Crown collectively agreed "to [f]inish the Project if the Borrower is [u]nable to [d]o [s]o" to protect their respective interests. The First Amendment referenced the two loans Crown had made to the Borrower, the real property collateral securing the loans, and the pending foreclosure action. The First Amendment stated specifically its intent was "to amend the ALC Participation."

Section 1.1 of the First Amendment laid out the parties' course of action if Borrower was unable to complete the project or defaulted:

ALC agrees to increase their participation from $2,500,000 to $6,000,000 (using non [EB]-5 funds) and Crown will agree to commit to increase the current loan balance in the amount of $6,084,502.30 up to an additional $1,500,000 as a senior lien. To the extent[] that more funds will be required to complete the Project, Crown hereby commits to fund such amounts in a senior lien position.

Section 1.3.2 stated that "[i]n the event of a liquidity event, Crown will maintain the 1st lien position on the proceeds of the sale/funds according to the Loan Documents, Crown will be paid out first and then ALC will be repaid."

Justin Blackhall, a principal of ALC and its finance counsel, testified that ALC agreed to invest $3.5 million dollars under the First Amendment "to encourage [Crown] to enter into [the] agreement." In a July 12, 2019 email discussing the contents of the First Amendment, Blackhall stated that "[ALC's] $3.5 [million] is going in first so there is no risk to Crown on this."

In January 2021, Blackhall notified Crown that USCIS had formally denied the project eligibility under EB-5. ALC has not repaid any of the five overseas investors who invested their money through 15277 L.P. and none of those investors have filed suit against ALC for the loss of their investment.

In March 2021, ALC filed a complaint against Crown, alleging breach of contract and the implied covenant of good faith and fair dealing, and common

law fraud and sought declaratory judgment to establish priority of the various lien interests.

Foreclosure Proceeding and Sale

That same month, an amended final judgment in foreclosure was entered in favor of Crown. In July 2022, Crown purchased the foreclosed property, where the project was to be constructed, at a sheriff's sale and assigned its bid to Crown Real Estate Holdings, Inc., a wholly owned subsidiary of Crown. In late 2023, Crown Real Estate Holdings, Inc. sold the property to a third-party purchaser. On May 3, 2024, Crown informed ALC of the sale. The property was sold for $7 million dollars with net proceeds received from the sale amounting to $6,552,162.36. At the time, Crown had a balance of $12,801,191.28, comprised of principal, interest, and other fees on the project loans.

Final Judgment and Consent Judgment

After a six-day bench trial, the court entered an order for final judgment on February 13, 2025, dismissing all of Crown's counterclaims except its declaratory judgment action. The court entered a declaratory judgment as to the parties' respective priorities under the Participation Agreement and First Amendment finding: (1) the parties had a shared interest in the principal amount

8

of the $6,020,718 first loan; (2) ALC's investment of $2,500,000 created a 41.523% shared interest in the first loan; (3) the principal amount of the parties' investment in the first loan was to be paid first proportionately; (4) after payment of the principal amount, the parties were entitled to their proportionate interest payments earned on their principal amount invested in the first loan; (5) Crown was entitled to any remaining proceeds; and (6) Crown's second loan was subordinate to the parties' shared interest on the first loan. Judgment was entered in favor of Crown in the amount of $53,219 for certain expenses.

Thereafter, the parties entered into a Consent Judgment as to the monetary allocation of the proceeds based on the trial court's final judgment order. Final judgment was entered in favor of ALC in the amount of $2,551,041.44.

II.

On appeal, Crown contends the court erred in its determination on the declaratory judgment that the parties had a shared interest in the first loan because the plain language of the Participation Agreement states that Crown has first priority. Crown also asserts ALC was not a party to the contract; 15277 L.P. was, and, therefore, ALC lacks standing to pursue this action.

We apply a deferential standard in reviewing a trial judge's factual findings. Balducci v. Cige, 240 N.J. 574, 594-95 (2020). In an appeal from a

A-2565-24

non-jury trial, we "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We employ a de novo review of the judge's legal interpretation of a contract. Serico v. Rothberg, 234 N.J. 168, 178 (2018).

A.

We begin by addressing Crown's argument that ALC lacks standing to assert any contract claims against Crown because 15277 L.P. was the party in interest and ALC did not have any agreement with Crown.

The trial court found ALC had standing, citing to Medical Society of New Jersey v. AmeriHealth HMO, Inc., 376 N.J. Super. 48, 61 (App. Div. 2005), and stating:

> In this case, the evidence is clear that ALC is a party to the contract and has a vested interest in the outcome. The Participation Agreement clearly states the agreement "is made and entered . . . by and among Crown Bank . . . and American Lending Center, LLC . . . on behalf of ALC [15277] L.P. . . ." The same

A-2565-24

provision can be found in the [First] Amended Agreement. The evidence at trial established that ALC reported the loan on ALC's balance sheet and reported it as ALC capital. In executing the Participation Agreement, ALC's Chief Operating Officer, Stella Zhang, testified she signed the agreement on behalf of ALC. According to Zhang, ALC 15277 [L.P.] was formed solely for the Project and not for the individual investors. ALC used its own resources in the handling of this loan. Throughout this matter, ALC treated the loan as if it was the owner of the loan and Crown only dealt with ALC.

As a result, this [c]ourt finds ALC is a party to the contract, has a vested interest in the outcome and has standing to bring this action.

[(First alteration and omissions in original).]

The court also determined ALC was a real party in interest and, therefore, a third-party beneficiary of the Participation Agreement and First Amendment, granting it standing to assert its contractual claims.

We are satisfied the trial judge correctly concluded that ALC has standing to assert claims against Crown. ALC's Chief Operating Officer Stella Zhang testified that "[ALC] form[s] limited partnerships with different investors. ALC is the general partner, wherein . . . foreign investors are limited partners." Zhang further stated that "ALC is a lender, so ALC raise[s] money from foreign investors to fund the loans and make[s] interest[,] income and fees out of the loans." Thus, while the capital contributions for this project only came from

11

15277 L.P., ALC performed an important administrative role in the loan, negotiating and signing the agreements on behalf of 15277 L.P., and including the capital contributions of 15277 L.P. on ALC's own balance sheet. Zhang also testified that ALC had been involved in almost one hundred deals and that the only time the foreign investors were denied EB-5 status was in this case.

ALC has demonstrated it was a party to the Participation Agreement and First Amendment and had a vested interest in the outcome. Therefore, the trial court did not err in finding ALC had standing to assert claims against Crown.

B.

We turn then to Crown's contention that "[t]he trial court erred by failing to enforce the Participation Agreement and First Amendment as written" because "[t]hose agreements granted Crown first priority to the liquidated proceeds from the sale of the collateral, expressly denying ALC a pro rata share of the proceeds."

Our review is guided by "familiar rules of contract interpretation." Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 615 (2020) (quoting Serico, 234 at 178). The starting point of the interpretive inquiry is the plain language of the contract, id. at 616, construed "given its ordinary, reasonable meaning absent" a showing that "it was used in a different sense." McKenna v. Rosen,

239 N.J. Super. 191, 196 (App. Div. 1990) (citing <u>Friedman v. Tappan Dev.</u> <u>Corp.</u>, 22 N.J. 523, 530-31 (1956)).

Further, courts "enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances[,] and the underlying purpose of the contract.'" <u>Manahawkin Convalescent v. O'Neill</u>, 217 N.J. 99, 118 (2014) (quoting <u>Caruso v. Ravenswood Devs., Inc.</u>, 337 N.J. Super. 499, 506 (App. Div. 2001)). "[W]hen the intent of the parties is plain[,] and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." <u>Quinn v. Quinn</u>, 225 N.J. 34, 45 (2016). As such, courts will not "make a better contract for either party." <u>Graziano v. Grant</u>, 326 N.J. Super. 328, 342 (App. Div. 1999).

Our careful review of the Participation Agreement and First Amendment reveals the trial court erred in its interpretation of those clauses in allocating the proceeds between Crown and ALC on a pro rata basis. Section 6.1 of the Participation Agreement is entitled "Subordination of ALC Participation Interest." It provides unambiguously that "ALC hereby subordinates and makes junior the indebtedness represented by the ALC Participation Interest," and "ALC's rights to repayment of the indebtedness represented by the ALC Participation Interest is hereby subordinated and secondary to Crown's rights to

13

repayment." It further explicitly states that any amounts obtained after an event of default pursuant to the remedies articulated in the loan documents "shall not be distributed pro rata, but shall be used first to repay the indebtedness represented by the Crown Loan Interest in full."

The First Amendment preserved the order of priority of payments under Section 1.3.2 in providing that Crown would maintain its first lien position in the event of a liquidity event.

Here, when the Borrower defaulted, Crown foreclosed and purchased the deed to the property. That was the permitted remedy for default. Under the plain language of the Participation Agreement and First Amendment, Crown was entitled to retain the proceeds from the sale of the collateral up to the amount of the sums it was owed. Only after Crown was completely repaid was ALC's right to repayment triggered. Because the sale proceeds were not even sufficient to cover the debt owed to Crown, ALC was not entitled to any recovery.

The trial court focused on the Participation Interest Percentage listed in an appendix to the Participation Agreement to support its pro rata allocation of the proceeds. However, that interest was simply an identifier of how much money ALC put into the loan in relation to the total loan—41.523%. The Participation Interest did not determine what ALC was entitled to recover in the

14

event of default and a liquidation of collateral. Rather, the procedure following default and liquidation of the collateral was governed by the Participation Agreement and the First Amendment.

The First Amendment explicitly discusses in its Recitals paragraphs the first and second loans, defining them collectively as "Loans." Further, the First Amendment incorporates the Participation Agreement in stating that "[a]ll other terms and conditions of the original ALC Participation will remain in full force and effect," and that "[i]n the event of a liquidity event, Crown will maintain the [first] lien position on the proceeds of the sale/funds according to the Loan Documents, Crown will be paid out first and then ALC will be repaid." These provisions make it clear that the First Amendment served to modify the Participation Agreement, referring to both of Crown's loans, and that Crown retained first priority status for its loans on the project.

Under the plain and ordinary terms of the governing documents, Crown was entitled to first priority repayment on its loans from the liquidation proceeds. Therefore, we reverse the final judgment entered in favor of ALC and remand to the trial court to enter judgment on Crown's counterclaims to apply the sale proceeds to only satisfy Crown's outstanding principal and interest. The trial court shall entered a final judgment accordingly.

A-2565-24

Reversed and remanded for further proceedings in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2565-24